In re NMI SYSTEMS, INC. and Network Management, Inc., Debtors.

NMI SYSTEMS, INC. and Network Management, Inc., Plaintiffs,

v.

Edward M. PILLARD, Defendant.

Bankruptcy Nos. 93–00934, 93–00935. Adv. No. 94–0026.

United States Bankruptcy Court, District of Columbia.

Jan. 20, 1995.

As Corrected March 29, 1995.

358

Duane D. Morse, Washington, DC, for plaintiffs.

J. Stephen Simms, Baltimore, MD, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

S. MARTIN TEEL, Jr., Bankruptcy Judge.

The plaintiffs, affiliated debtors in possession, have sued Edward M. Pillard to recover, as preferences or fraudulent conveyances or as amounts subject to turnover, sums paid to him as bonuses or draws on bonuses in the year preceding the filing of the debtor's bankruptcy cases. The court has heard the evidence and the arguments of counsel at a trial of November 22 and 23, 1994, and now makes the following findings of fact and conclusions of law.

---

1. The turnover claim and the fraudulent conveyance claims were essentially the same, that Pillard was not owed the amounts paid him. The plaintiffs made no showing that Pillard had any of those sums when the debtors' cases were filed

The court has already granted judgment in favor of Pillard at the close of the plaintiffs' case ruling that none of the payments made for bonuses were fraudulent conveyances on the basis of the alleged grossly unreasonable generosity of the bonus plan. The plaintiffs did not press their turnover claim in their closing argument, and the court deems it abandoned.[1] The only claims that remain are the preference claim under 11 U.S.C. § 547 and the claim that the payments of bonus for 1993 were fraudulent conveyances because the bonus plan was not in place in 1993. The court will rule in Pillard's favor as to these claims as well.

### The Proceeding in a Nutshell

Before getting into the details of the proceeding, it is useful to summarize what is at issue. The payments can be divided into three categories:

1. $11,665.50 in bonus draws towards 1992 bonus;

2. $62,208.00 of the 1992 bonus paid in 1993 in three installments; and

3. $24,997.50 in bonus draws made in 1993 towards 1993 bonus.

Except for $2,000.00 Pillard would receive in a chapter 7 case as a priority wage payment, the payments satisfy the definition of a preference if Pillard was not an insider of the debtors. Of the draws for 1993 bonus, payments of $6,666.00 (less the $2,000 that would have been received as a priority wage claim) also qualify as a preference even if Pillard was not an insider because these draws were made within the 90 days preceding the filing of the petition. The bonus draws in 1993 are each additionally subject to attack as fraudulent conveyances if no bonus plan was in effect. So the issues are:

1. Was Pillard an officer or otherwise an insider?

2. If Pillard was an insider—or as to the $4,666.00 of payments that were pref-

and, accordingly, there was nothing subject to the turnover power of 11 U.S.C. § 542: the plaintiffs thus are left to recover any unauthorized payments as fraudulent conveyances.

erences even if he was not an insider— do the exceptions invoked by Pillard (§§ 547(c)(1), (2) or (4)) apply?

3. Are the $24,997.50 in 1993 draws alternatively recoverable as a fraudulent conveyance on the basis that no bonus plan had been adopted for 1993 or that the bonus plan was outrageously generous?

The court concludes:

1. Pillard was not an officer.

2. The $4,660.00 in payments made within 90 days of the filing of the petition come within the exception of § 547(c)(2) and partially within the exception of § 547(c)(4).

3. Pillard's bonus plan was in effect in 1993 and not of a fraudulent character.

### *Primary Facts*

The debtor Network Management, Inc. ("NMI") and the debtor NMI Systems, Inc. ("NMI Systems") filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (11 U.S.C.) on September 23, 1993. NMI was simply a holding company, with NMI Systems a wholly-owned subsidiary. Thus, the debtors are affiliates of one another, 11 U.S.C. §§ 101(2)(A) and 101(2)(B), and insiders of one are insiders of the other. 11 U.S.C. § 101(31)(E). In practice, NMI Systems was referred to as "NMI" without any distinction between the two. The two will hence be referred to simply as "the company" in parts of this decision.

All employees were employees of NMI Systems. NMI had no accounts of its own, including no payroll account. The company was engaged in providing technical expertise regarding computer network systems, both to the government and to private companies. The company was thus viewed as having two sides: governmental and commercial. It was the latter side in which Pillard became employed. His particular line of business, consulting companies about computer networking problems, made up only a part of the company's commercial side.

In 1991 Francis A. Dramis was president and chief executive officer of the two debtors. Dramis had previously been at Salomon Brothers and been Pillard's boss at Salomon, except for Pillard's last six months there. During the first week of May 1991 Dramis was giving consideration to the company's hiring Pillard. He drafted an offer letter to Pillard and circulated it to Neill H. Brownstein, a member of the board of directors. Brownstein wrote to Dramis on May 6, 1991, raising questions about the bonus plan and stock options included in the offer letter. He concluded his letter by asking: "For an officer level position, should you sign the letter?"

The company had a Compensation Committee of which Dramis was chairman and two venture capital investors on the board were members. The Compensation Committee was responsible for approving compensation packages for all NMI officers, including periodic adjustments to base salary and other compensation components, and approving annual incentive plans for NMI officers. Dramis recalls discussing Pillard's proposed employment terms with the other Compensation Committee members and obtaining acquiescence in the terms he offered. It appears, however, that the Compensation Committee was not concerned exclusively with executive officers, those responsible for overall management of the company. The committee also considered divisional managers who were accorded a vice presidential title. Naturally, the company's board of directors might want to scrutinize not only the compensation of executive officers but that of divisional managers as well, who would be receiving significant compensation, including potentially costly bonus incentive packages, as part of their employment.

On May 13, 1991, Dramis wrote Pillard offering him the position of "VP–Eastern Region, Network Systems Division ... reporting directly to the President/CEO." The terms of compensation were:

1. Annual base salary of $140,000.

2. 1991 bonus plan: greater of (a) $50,-000 or (b) 5% of revenue in excess of $7,200,000 offset dollar for dollar by any operating losses exceeding $319,000 and less .2% per month of the value of billed receivables over 90 days.

3. 1992 bonus plan: 5% of revenue over $7,200,000 (or the 1991 revenue, whichever is the greater) and offset dollar for dollar by operating income falling below 8% of revenue for the first six months of the calendar year and 10% for the last six months of the calendar year, and also offset by .2% per month of the value of billed accounts receivable over 90 days. The bonus would be increased by 5% of each dollar of operating income in excess of 8% of revenue for the first six months and 10% for the last six months of the calendar year. Operating expenses recognized in determining operating income for the bonus calculation, to the extent they represent allocations from the Corporate Office, other than the office of the President/CEO, will be limited to 6% of revenue. 50% of any bonus payable would be paid quarterly during the year with the remaining 50% paid after completion of the year.

Pillard accepted the offer on May 17, 1991, and became employed on June 1, 1991. Pillard's office was initially in New York City and later in New Jersey. The company's headquarters was in Fairfax, Virginia. Pillard only visited headquarters four or five times a year.

Pillard was a member of the company's Strategy Team. Minutes of the November 26, 1991, meeting of the board of directors are instructive as to the nature of the Strategy Team. During the morning session, the meeting undertook "a thorough review of the 1992 business plan" and during the afternoon session the meeting addressed formal board business. The notes reflect that Dramis and various outside directors attended and that "[a]ttending on behalf of NMI management were Chuck Riviere and Joe Wiley. In the morning session the meeting was attended by members of the Strategy Team: Ed Pillard, Herb Klein, Mike Goodman, Dave Karish and Carl Patrick." No evidence has been presented that Mike Goodman or Dave Karish ever had a title suggestive of being an officer. Pillard already had a regional vice president title and Patrick was to shortly. After Dramis reviewed the progress of his plans for the company, "[t]he morning session was a review of the specific plans of each of the regions from a selling point of view, presented by Chuck Riviere and a review of the specific financial plans as presented by Joseph Wiley." The minutes further reflect that in the afternoon session, at which the Strategy Team was not in attendance, the board addressed the election of certain officers and that the following officers were elected: Robert Hunt, VP—Government Region; Carl Patrick, VP—Southeast Region; Joseph Wiley, EVP—Finance and Administration, Secretary, Treasurer; and Kathleen Van Sleen, Assistant Secretary and Assistant Treasurer.

These minutes are consistent with Pillard's version, which the court accepts, of what the Strategy Team did: it was a group of the company's managers who met with the board three or four times to advise of the status of business efforts and to offer strategy suggestions regarding improving sales. The Strategy Team did not itself fix policy, but rather was merely advisory. The Strategy Team had no input regarding compensation of employees or payment of creditors.

However, the minutes also lend weight to Pillard's once holding a position in the company, regional vice president, that the company formally viewed as conferring officer status: the other regional vice president was elected as an officer at the meeting. On the other hand, the plaintiffs did not introduce any minutes reflecting a similar election of Pillard and offered no evidence as to the minutes of the corporation being incomplete. In any event, the position of regional vice president was an office Pillard no longer held when the allegedly preferential payments were made to him.

After NMI and NMI Systems filed their bankruptcy cases in 1993, found in the minute books of the company was a sheet of paper which recited as follows:

### DIRECTORS & EXECUTIVE OFFICERS
### NMI & SUBSIDIARIES
April 1992

NETWORK MANAGEMENT, INC. (Delaware)

| | |
|---|---|
| Francis Dramis | Chairman, Chief Executive Officer, President |
| Joseph L. Wiley | Executive Vice President, Finance & Admin. Secretary, Treasurer |
| Kathleen H. Van Sleen | Controller |
| Scott F. Hiller | Treasurer, Assistant Secretary |
| Robert Hunt | Vice President, Government Region |
| Carl Patrick | Vice President, Southeast Region |
| Ed Pillard | Vice President, Northeast Region |

The sheet also listed five other individuals who served as directors. No one offered an explanation of how this document was prepared and for what purpose. More importantly, it related to a position that Pillard had ceased to hold when the allegedly preferential payments were made to him.

Terrence Bruggeman became the company's chief executive officer after the bankruptcy cases were filed. Bruggeman filed a 1993 income tax return listing 17 officers of the corporation. Pillard was one of the individuals listed as an officer, but the company had an interest by then in taking an expansive view of who was an officer. The 1992 tax return, significantly, was not offered into evidence.

Dramis and Joseph L. Wiley, as directors of NMI Systems, signed a resolution effective April 15, 1992, electing the following as officers of NMI Systems:

| | |
|---|---|
| Francis Dramis | Chief Executive Officer |
| Robert Hunt | President |
| Joseph L. Wiley | Executive Vice President—Finance and Administration, Secretary, and Chief Financial Officer |
| Kathleen H. Van Sleen | Controller and Assistant Secretary |
| Andrew Snow | Vice President |
| Scott F. Hiller | Treasurer and Assistant Secretary.[2] |

Pillard could still be an officer even if not an elected officer, and the resolution would not govern who were the elected officers of NMI versus NMI Systems. But two things are significant about the resolution. First, it followed by two days a change, discussed below, in Pillard's job assignment. Second, it is curious that if the two companies were operating as one, that Pillard would not be an elected officer of NMI Systems if he was an elected officer of NMI. No one offered into evidence the corporate by-laws or other corporate papers that discussed the categories of officers each corporation was to have.

Kathleen H. Van Sleen, who was employed by the company prior to Pillard's arrival and worked in various accounting and other positions in the headquarters office, testified that Pillard was an officer of NMI but not of NMI

---

**2.** Snow's and Hiller's names and positions, without explanation, had a line drawn through them on the copy of the resolution placed in evidence.

Systems. However, her testimony on this score was conclusory with no explanation of how she arrived at the conclusion he was an officer. Similarly, in deposition testimony Joseph Wiley, the executive vice president, testified that Pillard was an officer without explanation. Neither of these witnesses, nor Bruggeman (who was not even at the company when most of the payments at issue were made), described Pillard's functions (aside from his service on the Strategy Team) such as to allow the court to determine whether those functions would qualify him as an officer as that term is used in the definition of "insider."

On April 13, 1992, Dramis wrote to Pillard after a brief discussion with him which Dramis, not Pillard, initiated. Pillard had no input into the changes addressed in that conversation. The letter (ex. 14) set forth changes Dramis was making in Pillard's employment terms. First, Dramis stated, "we are changing your assignment to that of VP–Technical Services beginning May 1, 1992 and reporting to Jim Knowles." Jim Knowles was the recently arrived Vice President in charge of the company's Applications Development Division, a division created at a time the company was beginning to reorganize its business according to lines of business versus regions. (See ex. 24.) By September 1992 the company had fully converted to being organized on the basis of lines of business. Second, Dramis stated, Pillard's new compensation elements were to be:

SALARY: $100,000 per year Base Salary on an annualized basis plus $650 per month car allowance. You would also be eligible for a recoverable draw against your bonus equal to $3,333 per month. BONUS: You would be eligible for 50% of any Personal Consulting Revenues up to $100,000, plus 30% of such Revenues over $100,000.

LINE OF BUSINESS BONUS: Beginning July 1, 1992, you would also be eligible for 5% of the Revenue associated with the consulting Line of Business, reduced dollar for dollar by negative contribution for that business after July 1, 1992.

Pillard responded by writing "acknowledged" on the memorandum because it was Dramis's unilateral modification. Dramis testified that Pillard's salary was decreased because "[h]e was hired for a regional vice president job which was of a certain scope and then we reduced that job to be less of a scope and reduced his salary component associated with that and had him then report into Jim Knowles when Jim came in." As in the case of his initial compensation terms, the changes in Pillard's compensation were approved by the compensation committee by Dramis discussing the changes with members of the committee in individual discussions and obtaining their concurrence.

Pillard's description of the reasons for the structure of his new bonus plan shed some light on the principal functions Pillard was to perform. Dramis told Pillard that the plan included the safeguard of taking into account negative contribution because Dramis did not want Pillard to bring on new business so fast that the company would suffer losses in devoting resources to the new business before the company began receiving a stream of revenues. Pillard's new function was to manage a unit, consulting, with the principal focus of bringing in new clients in an orderly manner. Pillard, in short, was the manager of a sales unit of the company, doing personal consulting work himself as well as supervising other employees performing consulting work.

Aside from the 1991 job offer letter and the April 13, 1992, memorandum, Pillard received no other written communications about his vice president title. The only discussion he had about it was a conversation with Dramis in which Dramis told Pillard that he could use the title of vice president to assure greater status in marketing efforts.

Others besides Pillard had the title of vice president but never appeared on a list of officers. For example, Herb Klein was Vice President and Chief Technology Officer; other vice presidents were Messrs. Khazenie, Fu, Manks, and Nickerson. When asked about the latter four vice presidents, Dramis testified that these individuals were not elected officers and that he did not believe that compensation committee approval was needed for such individuals and that he did not as a matter of course discuss non-officer compensation with the compensation committee.

Dramis generally only discussed bonuses with the compensation committee when the person involved reported directly to him as an officer. But Dramis was uncertain whether there were persons who were officers even though they only reported to another person who reported to Dramis. That Dramis discussed the 1992 changes in Pillard's compensation suggests that Pillard was viewed as an officer. But Pillard had initially reported directly to Dramis and hence came within Dramis's guidelines for discussing compensation with compensation committee members: Dramis himself was making the changes, not someone who reported to him and who would be responsible for assuring that all necessary approvals were obtained.

No one ever told Pillard he was an officer; no one ever briefed him concerning duties as an officer (as opposed to as a manager in charge of the consulting line of business). Pillard was unaware that there was a compensation committee that had to approve officers' bonus plans. From Pillard's perspective, the officers of the company were Dramis, Wiley, Riviere, Van Sleen, and, for a period of time, Scott Hiller: these were the people who ran the company as a whole, as opposed to managing a single line of the business. In contrast to Pillard, these officers worked directly with the board of directors, worked on obtaining financing, worked on attracting new capital, and their attention was devoted to the corporation overall. Pillard had no authority to control the timing of payment of his own salary and bonus. All of this suggests that Pillard was not an officer.

Although the April 13, 1992, letter referred to Pillard's new position as VP–Technical Services, consulting was the actual line of business he took over managing. Although Knowles was between Pillard and Dramis on the company's chain of command, Pillard continued on occasion to discuss company matters directly with Dramis. As a manager, Pillard was responsible for recommending salaries and bonuses for the people who worked for him. Those who worked for him who received bonuses were paid such bonuses on a quarterly basis for work they sold and for work they serviced. Pillard would submit quarterly Personnel Action Requests

("PARs") based on the individuals' time reports requesting payment of the bonuses. At the Fairfax headquarters the personnel office would examine the PARs and, Pillard believes, someone at the senior level would then sign off.

In comparison, Pillard's bonus was to be handled identically except that his was to be paid on an annual basis, with the right to take draws after May 1, 1992, against the bonus. Pillard recalls that other senior managers (Jim Knowles, David Fu, Bob Hunt and Kathy Boyd are examples) were also paid a bonus on an annual basis. Van Sleen recalls that bonus plans for "officers" were approved by the board of directors, with the bonus plans adopted after the budget for the year was adopted, usually in the fourth quarter of the year before. She could recall no budget plan for officers being adopted for 1993. However, Pillard's compensation package was an exception to the general rule Van Sleen had observed: his bonus plan for both 1991 and 1992 was adopted upon his being hired in 1991 and was then altered in mid-year 1992, not as part of the budget process. After the changes in Pillard's compensation in April 1992, Pillard was entitled to draw against his bonus at the rate of $3,333 per month or $1,666.50 per twice-monthly pay period. He was initially under the impression that he could obtain a quarterly payment of his bonus and hence stopped the draws for four pay periods until he learned that he would not be paid the bonus quarterly. He received a makeup draw of $5,000 and by year-end he had drawn $23,332.50 toward his bonus for 1992.

It was determined that he was entitled to a total of $85,538.55 in bonus for 1992. This determination was initiated by Pillard's telephoning Dramis and discussing Pillard's determination that he was entitled to a bonus of $85,538.60. Pillard followed this up with an electronic mail memorandum to Dramis. Upon review by Kevin Phillips of the accounting section it was determined that the correct figure was $85,538.55. Both Wiley and Dramis signed approvals for the computation of the bonus, as well as a deferred manner for payment of the unpaid balance.

Because of a tight cash flow, the $85,538.55 bonus was to be paid in three equal install-

ments of $28,513 each (with the first installment reduced by $23,331 in prior draws to $5,182) when the company paid compensation for January, February and March and the installments were paid when payroll was duly made for the payroll period ending at the end of each such month. So, in 1993, Pillard received $62,208 to pay the balance owed for the 1992 bonus after draws.[3] Of the $23,331 in prior draws for 1992 bonuses, only the sum of $11,665.50 was paid to Pillard during the one-year period preceding the filing of the debtors' bankruptcy cases. (These draws were paid at the rate of $1,666.50 per bi-weekly pay period on pay dates ranging from October 7, 1992 to January 8, 1993.)

The company's tight cash flow was a significant problem. The company had missed a payroll tax payment to the Internal Revenue Service in July 1992. In the fall of 1992, a creditor, Banyan Company, had discovered that the company had taken checks from customers that had been intended for a lockbox arrangement to protect Banyan. This discovery led Banyan to place the company on a tight repayment schedule starting toward the end of 1992, to be personally supervised by Dramis. In adhering to that schedule, the company missed other payroll tax payments. The missed July 1992 payment of $208,871.18 was not paid until May 13, 1993. The company ran over a month behind in paying the payroll taxes of $176,355.21 for the payroll period ending December 15, 1992; and then ran over four months behind in paying payroll taxes of similar magnitude for the payroll periods ending December 31, 1992; January 15, 1993; January 31, 1993; and February 14, 1993. It made no payment of the payroll taxes for the next eight payroll periods. It resumed paying payroll taxes by paying those for the payroll period June 30, 1993 over two weeks late. However, Pillard knew nothing about the missed payroll tax payments until after he had received the last installment of his bonus for 1992 on April 7, 1993.

Both before and after the decision to pay the balance of Pillard's 1992 bonus in installments, the company was regular in making payroll payments to its employees. The company, despite its financial difficulties with Banyan, was enjoying purchases during 1992 of shares of stock by officers such as Van Sleen based on the anticipated future profitability of the company. It is apparent that someone must have believed that the company would weather the storm and concluded that it would be justified to continue operations, pay employees the compensation to which they were entitled, and short the Internal Revenue Service in the payment of payroll tax obligations to the extent necessary to continue operations. Not paying the employees obviously might have had the disastrous consequence of employees leaving this services-based company; not paying the IRS would not have such immediate adverse consequences—that new involuntary lender could be dealt with in due course.

Pillard had no role in making those decisions. Like other employees, he expected to be paid and would otherwise have likely left: he landed an equally remunerative position promptly after being terminated in August 1993. Pillard's influence over the decision to make payment to him appears to have been no greater than that of any other employee: his leverage was his ability to leave and deprive the company of his valuable services.

To summarize, for 1992 Pillard received the following amounts towards bonus in the one-year period preceding the filing of the bankruptcy cases:

$11,665.50 in 1992 draws.
$62,208.00 in installment payments in 1993.

Total: $73,873.50.

Pillard also received 15 draws of $1,666.50 towards 1993 bonus in 1993, a total of $24,997.50. Of these, four (a total of $6,666.00) were received in the 90-day period preceding the debtors' filing of their bankruptcy petitions on September 23, 1993.

---

**3.** The parties have stipulated that Pillard was paid $62,154 (excluding draws) for his 1992 bonus. Stipulated Facts paragraph 6. This is an apparent, mathematical error that is inconsistent with the parties' stipulation that the three installment payments in 1993 were for $5,182; $28,-

513; and $28,513 totalling $62,208. To further confuse matters, the plaintiffs' counsel stated in his opening statement and closing argument that the amount was $63,145.00. Because of the court's conclusion that Pillard was not an insider, the precise correct amount is not important.

*Discussion*

I

■ The court addresses first the plaintiffs' fraudulent conveyance claim. Based on the bonus plan adopted on April 13, 1992, for Pillard, and assuming it remained in place in 1993, Pillard was entitled at the end of 1993 to a bonus in excess of the $24,997.50 he received in draws in 1993. The plaintiffs attack the $24,997.50 in draws as a fraudulent conveyance by contending that the bonus plan was not in place in 1993. The court rejects this contention.

A.

The memorandum of April 13, 1992, contained no qualification regarding how long the bonus plan would be in place. Pillard's original compensation terms had provided for a bonus only for the years 1991 and 1992. The April 13, 1992, letter, in contrast, set forth new compensation terms and did not restrict the duration of the bonus components. Because Pillard was originally being compensated at $140,000 base salary and effective May 1, 1992, was being reduced to a $100,000 base salary, his reasonable understanding was that, until notice of a further change, he was to receive all compensation elements spelled out in the April 13, 1992 letter. The company acted consistently with that understanding by paying him his monthly draws against bonus of $3,333. Had the company notified him that he was to be paid only $100,000 annually without bonus, this would have been inadequate compensation for him, and he would have left the company. Based on the company's course of conduct and the inadequacy of Pillard's compensation without the bonus component, and the lack of any temporal limitation on the duration of the bonus arrangement, the court finds that Pillard's bonus plan was in place in 1993.

As discussed above, Van Sleen generally observed an adoption of a bonus plan for the entire company as part of the budget preparation process shortly after the conclusion of the prior year. But Pillard's original bonus plans for 1991 and 1992 had been adopted in May 1991 incident to his being hired and hence were not adopted only at year-end. Similarly, the 1992 changed bonus plan was adopted in April 1992 not at the end of 1991. The terms were approved by the compensation committee, and it clearly had the authority (as in the case of the original bonus terms for Pillard) to fix those terms other than as part of the budget process.

In 1993, there were discussions in the company about changing all bonus-recipients' bonus plans to a basis consistent company-wide for all officers and senior management. However, despite what Pillard understood to be an intention to compensate him pursuant to the new bonus plan, that plan was never adopted.

For all of these reasons, the court concludes that the bonus plan adopted in April 1992 was in effect in 1993. Accordingly, there was no fraudulent conveyance.

B.

■ As an alternative basis for decision, the court notes that even if Pillard's bonus payments in 1993 were not pursuant to any bonus plan in effect, no fraudulent conveyance occurred. The absence of a bonus plan would only raise a corresponding question of what Pillard's base compensation should have been. Plainly $100,000 would have been inadequate base compensation had no bonus plan been in effect. Pillard would have been entitled to greater compensation on a quantum meruit basis. His initial compensation package was a base salary of $140,000, with bonus plans specified for 1991 and 1992 but not for 1993. When the package was altered in April 1992 for the year 1992 to reduce the base salary to $100,000, this was offset by a corresponding altered bonus package for 1992. Those two changes went together. If one, the bonus package, was dropped for 1993, then logically the base salary change was dropped as well, and the base salary reverted to $140,000. Yet, the company paid him at only a $100,000 base salary (with two modest increases towards the end). Had Pillard received base salary at the annual rate of $140,000 without any bonus draws, this would have almost sufficed to assure him the same total compensation he received in

1993. Pillard received base salary compensation for work performed in 1993 of $70,294.03 [4] versus the $89,929.78 the court computes (by a proportional increase of each paycheck) that he would have received had he been compensated at $140,000 per annum instead. Thus, at a $140,000 salary he would have earned an additional $19,635.75, which is $5,361.75 less than the $24,997.50 in bonus draws he received in 1993.[5]

The court has already granted Pillard partial summary judgment establishing that he has a setoff of $5,734.17 against any fraudulent conveyance claim. Because the setoff exceeds $5,361.75, Pillard can have no liability for a fraudulent conveyance, even if there was no bonus plan in effect in 1993.

## II

For transfers made between 90 days and one year before the date of the filing of the petition to constitute avoidable preferences, Pillard must have been an insider. 11 U.S.C. § 547(b)(4)(B). The term "insider" is defined by 11 U.S.C. § 101(31) as follows:

"insider" includes—

(A) if the debtor is an individual—

(i)   relative of the debtor or of a general partner of the debtor;

(ii)  partnership in which the debtor is a general partner;

(iii) general partner of the debtor; or

(iv)  corporation of which the debtor is a director, officer, or person in control;

(B) if the debtor is a corporation—

(i)   director of the debtor;

(ii)  officer of the debtor;

(iii) person in control of the debtor;

(iv)  partnership in which the debtor is a general partner;

(v)   general partner of the debtor; or

(vi)  relative of a general partner, director, officer, or person in control of the debtor;

(C) if the debtor is a partnership—

(i)   general partner in the debtor;

(ii)  relative of a general partner in, general partner of, or person in control of the debtor;

(iii) partnership in which the debtor is a general partner;

(iv)  general partner of the debtor; or

(v)   person in control of the debtor;

(D) if the debtor is a municipality, elected official of the debtor or relative of an elected official of the debtor;

(E) affiliate, or insider of an affiliate as if such affiliate were the debtor; and

(F) managing agent of the debtor;

As stated in *In re Erin Food Services, Inc.,* 980 F.2d 792, 796 (1st Cir.1992), "[t]he one-year preference period is designed to inhibit insiders—entities normally privy to inside financial information long before it becomes available to arm's-length creditors—from influencing the insolvent debtor to deplete its remaining assets for the insider's benefit to the detriment of non-insider creditors." The plaintiffs seek to hold Pillard an insider of NMI Systems (the debtor which paid Pillard) on two bases.

First, although they have not emphasized this argument in their post-trial brief, they appeared at trial to urge that Pillard was an insider based on his general position of influence or control in the company. As explained below, the court must reject this contention.

Second, they urge that he was an officer of NMI. If so, he was an insider of NMI and because NMI is an affiliate of NMI Systems, 11 U.S.C. § 101(2)(A), he was also an insider of NMI Systems. 11 U.S.C. § 101(31)(E).

**4.** Pillard received two salary increases in 1993. First, effective April 1, 1993, his salary increased to $110,000. Second, effective July 1, 1993, his salary increased to $125,000.00. He was advised that he was being terminated on August 20, 1993, and received his last paycheck for the period ending August 31, 1993.

**5.** Although the company was additionally paying Pillard a $650 per month car bonus in 1993, there is no evidence that this payment was not in the nature of a rough reimbursement of expenses. The $650 was not treated by the company as income to Pillard for income tax purposes and there is no evidence as to the extent of Pillard's automobile expenses in 1991 and early 1992 versus after the change in position that led to the adoption of the $650 allowance. Accordingly, the court does not ascribe any receipt of net value to Pillard arising from the car allowance. At most, therefore, Pillard received $5,361.75 more in 1993 than he ought to, assuming that no bonus plan was in effect.

As discussed below, the court finds that he was not an officer of either NMI or NMI Systems.

### A.

■ Although it has not been as vigorously pressed, the court will first address the plaintiffs' argument that Pillard enjoyed a position of influence or control and hence was an insider. Examination of that issue will shed light on the general intent of the statute and hence will assist as well in addressing the second and more difficult issue of interpreting the term "officer" in the statute.

The base premise of the first argument is the correct observation that § 101(31)(B)(iii) specifically includes persons in control of the debtor as insiders and, moreover, extends to entities having undue influence over the debtor's actions because § 101(31)'s listing of specific examples of insiders is non-exclusive. As stated in *In re Holloway,* 955 F.2d 1008, 1010–11 (5th Cir.1992):

... Collier on Bankruptcy states that "[a]n 'insider' generally is an entity whose close relationship with the debtor subjects any transactions made between the debtor and such entity to heavy scrutiny." 2 Collier on Bankruptcy par. 101.31 at 101–87 (15th ed.1991). The legislative history of § 101(31) defines an insider as a person or entity with "a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor." S.Rep. No. 95–989, 95th Cong.2d Sess., reprinted in 1978 U.S.Code Cong. & Admin. News 5787, 5810.

[2] The cases which have considered whether insider status exists generally have focused on two factors in making that determination: (1) the closeness of the relationship between the transferee and the debtor; and (2) whether the transactions between the transferee and the debtor were conducted at arm's length. E.g., *In re Friedman,* 126 B.R. 63, 70 (9th Cir. BAP 1991) ("insider status may be based on a professional or business relationship with the debtor, in addition to the Code's per se classifications, where such relationship compels the conclusion that the individual or entity has a relationship with the debtor, close enough to gain advantage attributable simply to affinity rather than to the course of business dealings between

the parties"); *In re Schuman,* 81 B.R. 583, 586 (9th Cir. BAP 1987) ("The tests developed by the courts in determining who is an insider focus on the closeness of the parties and the degree to which the transferee is able to exert control or influence over the debtor."); *In re Benson,* 57 B.R. 226, 229 (Bankr.N.D.Ohio 1986) (an insider may be anyone "whose close relationship with the debtor subjects transactions made between the two parties to careful scrutiny"); *Matter of Lemanski,* 56 B.R. 981, 983 (Bankr.W.D.Wis.1986) (a transferee "is an insider if, as a matter of fact, he exercises such control or influence over the debtor as to render their transaction not armslength"); *Matter of Montanino,* 15 B.R. 307, 310 (Bankr.D.N.J.1981) (an insider "is one who has such a relationship with the debtor that their dealing with one another cannot be characterized as an arm's-length transaction").

What influence Pillard enjoyed in the company was not because of his title of vice president, but as a valuable employee enjoying leverage like other valuable employees because he could leave if not paid. (Actually, Pillard's leverage was broader: even non-valued employees enjoyed leverage because failure to pay any employee compensation would have adversely affected morale amongst other employees.) Such leverage is no different from that of a valuable supplier who can decline to make further deliveries if not paid for past deliveries. That leverage did not suffice to constitute Pillard an insider, one in a position of undue influence giving him an advantage as a creditor when the company decided what creditors to pay. His advantage was as a creditor of a particular type (a valuable employee), not as someone with an inside position of influence. The advantage Pillard enjoyed was not an "advantage attributable simply to affinity rather than to the course of business dealings between the parties." *In re Friedman,* 126 B.R. 63, 70 (9th Cir. BAP 1991). The court concludes that Pillard was not an insider unless he was an officer of the company.

### B.

Whether Pillard was an officer within the meaning of the definition of "insider" under

11 U.S.C. § 101(35) is a somewhat novel issue. The term "officer" is not defined in the Bankruptcy Code. The parties cited little case law even indirectly on the issue. In *In re Badger Freightways, Inc.*, 106 B.R. 971 (Bankr.N.D.Ill.1989), the court addressed the question whether a bank was in control of the debtor and hence an insider. In doing so, it looked by analogy to why officers were deemed insiders:

> The prospect always exists that a debtor can plan around the fixed 90 day period. In the case of a corporate debtor, this is most likely to occur when the parties involved in operating the corporation are also creditors of the corporation. Such persons may be the ones who actually select the date for filing of a voluntary petition. In addition, such parties (1) have greater access to information about the financial condition of the corporation and are therefore better positioned to anticipate the occurrence of bankruptcy, and (2) have the power to influence substantially the corporation's decision to make a transfer to satisfy their claim. The Bankruptcy Code recognizes this prospect and combats it by extending the preference period for such insiders and specifically designating directors and officers as insiders.

> .    .    .    .    .

> The perceived evil in the corporate officer situation is the assumption that the corporation does not undertake an independent review of whether the proposed transfer is in its best interest (those interests of its shareholders, and if insolvent its creditors). Rather it performs the transfer merely because directed by the corporate officer who made the decision approving the transfer. The ability of corporate officers and directors to influence corporate decision-making was deemed sufficiently great to justify a per se rule that those parties are insiders. 11 U.S.C. § 101(30)(B)(i), (ii) [now 11 U.S.C. § 101(31)(B)(i), (ii)].

> Applying this rationale to lending institutions, the key issue is whether the lending institution, like the corporate officer, is in a position to make the decision authorizing the transfer. The likelihood of damage to the interests of the debtor's creditors is most acute when the same party-in-interest is on both sides of the transaction resulting in the transfer....

*Badger Freightways,* 106 B.R. at 981–82.

Pillard's title of vice president and mid-management responsibilities of running the company's consulting division ought not suffice to make him an officer if he did not enjoy the elements of being an officer that would *per se* put him in a position of advantage as against other creditors. The difficult task is to articulate what, as a matter of law, suffices to make one a corporate officer as that term is used in the Bankruptcy Code's definition of insider. Aside from a Delaware Chancery Court decision the court views of no relevance, the parties have cited no case law that bears on this issue. In one Bankruptcy Code case, *In re Babcock Dairy Co. of Ohio, Inc.,* 70 B.R. 685, 690 (Bankr.N.D.Ohio 1986), the court merely observed that "the evidence does not demonstrate that [the defendant] performed any of the functions which might be expected of ... an officer ... of the corporation" in concluding that the defendant was not an officer. This court's limited research found no other cases addressing this issue under the Bankruptcy Code or under the Uniform Fraudulent Transfers Act (which, like the Bankruptcy Code, includes any "officer" amongst those treated as insiders, *see Holloway,* 955 F.2d at 1010). However, cases involving federal securities law or general common law liability of officers as fiduciaries have been helpful.

A federal securities law decision, *C.R.A. Realty Corp. v. Crotty,* 878 F.2d 562 (2d Cir.1989), is persuasive authority that a mere title of vice president does not suffice to make one an officer in the absence of the performance of important executive duties. In *Crotty,* the court of appeals addressed the question whether an employee's functions, rather than his title, determine whether he is an "officer" within the meaning of § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b)(1982), a provision that requires insiders, such as officers, to disgorge profits from any short-swing trading of the corporation's stock. That statute imposes strict liability without proof of use of insider

information and is analogous to the *per se* insider rule at issue in this proceeding. Crotty was an elected vice president of United Artists, serving as head film buyer for its western division, a division that contributed 15% to 18% of the company's total gross revenue. Despite a Securities Exchange Rule, SEC Rule 3b–2, since amended, that defined officer to mean a president, vice-president, secretary, treasurer or principal accounting officer, and any person routinely performing corresponding functions, the court of appeals held that Crotty's title was not determinative of whether he was an officer.

Rather, the court applied the same test it had earlier applied in holding that an individual enjoying no corporate officer title could nevertheless be an officer. The test was whether the individual "perform[ed] important executive duties of such character that he would be likely, in discharging these duties, to obtain confidential information about the company's affairs that would aid him if he engaged in personal market transactions." *Colby v. Klune*, 178 F.2d 872, 873 (2d Cir.1949), as quoted in *Crotty*, 878 F.2d at 566. The court accordingly did not hold Crotty liable merely because of his title as vice-president. Rather, it applied a test that it thought would best serve the Congressional purpose of curbing insider short-swing speculation. *Crotty*, 878 F.2d at 566–67. It required that the plaintiff establish that it was more likely than not that the employee's duties gave him access to inside information. *Crotty*, 878 F.2d at 567.

The evidence showed that Crotty's appointment as a vice-president was essentially honorary, and he had no access to inside information: his responsibilities and pay did not increase; he never attended board of directors' meetings and never received insider information from the board; and his own division's revenue receipts were publicly disseminated. Thus, he was not an "officer."

Of course, the *Crotty* test's focus on access to insider information is inappropriate to apply here: the concern of the preference statute is not access to inside information so much as being in a position that makes the transaction at less than arm's length. The

test ought to be one that takes account of the bankruptcy policies behind the use of the term "insider" in the preference statute and that is best designed to further those policies. But *Crotty* is illustrative of the point that the employee's functions and status, viewed relative to the statute's goals in using the term "officer," ought to control whether the person is an officer.

Additional support for this proposition is found in cases dealing with liability of employees, nominally titled officers, under common law causes of action holding officers liable for breaches of fiduciary duties to creditors of a corporation. The test appears to be whether the person was active in setting corporate policy. For example, in *W.H. Elliott & Sons Co. v. Gotthardt*, 305 F.2d 544 (1st Cir.1962), the court held that a division manager who held the title of clerk of the corporation was not liable under this common law cause of action:

> ... The Massachusetts cases with regard to the liability of corporate directors and officers to creditors for breach of their fiduciary obligations to creditors, or to the corporation itself, make it clear that the court has imposed liability only on corporate directors and major corporate officers. Frothingham's [the defendant division manager's] affidavit, to the effect that he was not active in corporate policy matters stands unchallenged. It is clear that as clerk he was not the kind of corporate officer described by the Supreme Judicial Court.

*Gotthardt*, 305 F.2d at 545. *See also Herm v. Stafford*, 466 F.Supp. 439 (W.D.Ky.1979) (mere employee of corporation does not occupy position of trust; honorary title of vice president did not make employee a "controlling person" for purposes of 15 U.S.C. §§ 77*o*, 78t).

■ In light of *Badger Freightways*, *Crotty*, and *Gotthardt*, the court believes the appropriate test for whether Pillard was an officer is whether Pillard occupied a high position within the corporation making him active in setting overall corporate policy or performing other important executive duties of such a character that it is likely that he would be accorded less than arms-length

treatment in the payment of his antecedent claim against the debtor. The term "officer" obviously includes anyone holding a position in which that person controls the decision whether to pay an antecedent claim. But it is broader and includes, for example, those in the collective group exercising overall authority regarding the debtor's corporate decisions who, as members of that insider group, are in a position to exert undue influence over corporate decisions regarding payment of their claims in tight financial times including those who are privy to critical information regarding the debtor's financial stability and able to act to their advantage on the basis of such information.

█ Applying this analysis to the facts of this proceeding, Pillard was not an officer. The plaintiffs concede that a mere title of "vice president" is insufficient to make an individual an officer. They urge that he was an officer because of testimony of other officers and employees that he was an officer, as well as documentary evidence mentioning him as an officer; Dramis's discussing Pillard's compensation with compensation committee members (with whom he held discussions only regarding officers); the extremely favorable terms of Pillard's bonus package; and Pillard's ability to demand and receive over $60,000 in bonus payments at a time when debtors could not meet their substantial payroll tax obligations. None of these facts, alone or in conjunction with each other, sufficed to make Pillard an officer.

The difficulty with the testimonial and documentary labelling of Pillard as an officer is that it is all conclusory, offering no illumination regarding Pillard's functions or where he was positioned from the standpoint of being able to influence decisions.

Similarly, that Dramis discussed Pillard's compensation with the Compensation Committee for approval is of little probative value. Although that committee had to approve the compensation of all officers, and Dramis only sought such approval in the case of officers reporting directly to him, the definition the company was using of officers may not be the same as the definition of officer under 11 U.S.C. § 101(31). Moreover, when Pillard's new compensation package was put in place in April 1993, he was reporting directly to Dramis as Vice President—Eastern Region and Dramis may have felt it advisable to run his new compensation by the Compensation Committee, even though afterwards Pillard would not report to Dramis but to Knowles and in a new position never listed by the company as an officer position.

Regarding the attractiveness of Pillard's bonus, the court has already rejected a fraudulent conveyance attack upon the reasonableness of this term of Pillard's compensation. While officers generally are among the more highly compensated employees of a company, it does not necessarily follow that the most highly compensated employees of a company are officers. That Pillard had expertise in a highly technical field and was able to command a relatively high level of compensation is evidenced by his landing a similarly remunerative job immediately after the debtors terminated his services.

Regarding Pillard's ability to obtain payment of his annual bonus after the debtor was already in substantial arrears in paying payroll tax obligations, this does not establish that he was an officer. As an employee-creditor his continued payment was necessary to assure that he remained at the company. That type of influence is not solely enjoyed by officers of a corporation but by other employees as well.

Viewing all of those factors together does not suffice to make Pillard an officer and certainly does not overcome other facts showing that Pillard was not an officer. During the period at issue, Pillard was no longer in charge of a division. He now reported to Jim Knowles, a new vice president in charge of a new division. Pillard was still in charge of a unit of that division, its consulting unit, and was accorded a title of vice president. But the title was clearly that of an assistant vice president, because Pillard's immediate superior was now a divisional vice president, Knowles. The title accorded Pillard status for purposes of marketing and as the boss of the unit he managed. But Pillard's position was not one in the inner circle making the company's critical financial decisions. He does not appear at this juncture to have been an elected officer, one of the few

blessed by a vote of the board of directors to be an officer. He thus did not enjoy that prestigious affinity that exists among elected officers that in appropriate circumstances may *per se* threaten preferential treatment vis a vis other creditors.

Other than as an employee and a valued one at that, Pillard was not in a position to influence the company's decisions regarding making payments of claims. His influence arose from his importance as an employee-creditor, not from being in an insider camp responsible for deciding company policy. Moreover, he was not even aware of the company's payroll tax difficulties until after his 1992 bonus was completely paid. Although he was told that the company had tight cash flow, this appears to have been nothing more than an effort to justify to him, as an employee-creditor, the delay in his receiving payment. It was not a disclosure made to give him inside information to alert him to seek prompt payment in order to protect himself to the disadvantage of other creditors.

One final matter of some possible relevance is the state law governing what officers NMI was required to have. Under Delaware law, "[e]very corporation ... shall have such officers with such titles and duties as shall be stated in the bylaws or in a resolution of the board of directors which is not inconsistent with the bylaws and as may be necessary to enable it to sign instruments and stock certificates which comply with §§ 103(a)(2) and 158 of this title." 8 Del.Code Ann. § 142(a). Here the plaintiffs put forth no evidence of the bylaws or charter of NMI and offered no board resolution electing Pillard an officer. Pillard appears to have been selected by an officer to work as a vice president, not elected by the board of directors to be an officer. Pillard was not treated as one reporting to the board of directors but reporting to officers selected by the board of directors, with his services terminable by his superiors versus by the board of directors. In selecting Pillard to carry the title of vice president the corporation did not follow corporate formalities that would be expected to be and were apparently usually observed in selecting officers. In the context of the preference statute, with its focus on protecting against less than arms-length transactions, the evidence of no corporate formalities being observed in selecting Pillard to carry the title of vice president, if it has any relevance, only strengthens the finding that Pillard was not an officer.

Pillard goes further and urges that unless he was an elected officer he cannot be an officer at all, citing *Goldman v. Shahmoon*, 42 Del. Ch. 227, 229–31, 208 A.2d 492, 493–94 (1965), and arguing that under, for example, *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991), state law ought to supply the answer to who is an "officer" under 11 U.S.C. § 101(31). The court disagrees. As in insider short-swing trading profits cases, *see Crotty*, 878 F.2d at 566, the term officer must be construed in light of the purposes for the use of that term. Varying state law decisions, themselves not of clear guidance on who is an officer, ought not control because their holdings may be at odds to that statutory purpose. For example, *Goldman v. Shahmoon* dealt not with what employees have the fiduciary responsibilities of officers but whether an employee could be noticed for deposition as the representative of a corporate party. A state court's narrow ruling on that technical question of civil procedure ought not govern who is an officer for purposes of the Bankruptcy Code's definition of insider.

Because Pillard was not an insider, the plaintiffs can only attack as preferences those 1993 bonus draws occurring within the first 90 days preceding the filing of the bankruptcy petitions. The court now turns to address whether any of those draws are excepted from the preference avoidance power by § 547(c).

### III

Pillard received four draws of $1,666.50, a total of $6,666.00, in the 90 days preceding the filing of the plaintiffs' bankruptcy petitions. Of this, $2,000 is not a preference because the debtors have not shown that Pillard would not have received that amount as a wage priority claim in a chapter 7 case. As to the balance of $4,666.00 Pillard invokes three exceptions to the preference avoidance

power: §§ 547(c)(1), 547(c)(2) and 547(c)(4). The court addresses each of these in turn.

### A.

■ Under 11 U.S.C. § 547(c)(1), the trustee may not avoid a transfer:

(1) to the extent that such transfer was

(A) intended by the debtor and the creditor . . . to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange;

The company and Pillard viewed the bonus draws as a way of compensating Pillard on an interim basis until the actual amount of the bonus for the entire year was computed. Bonus was accruing throughout 1993 and there was always a gap between the amount of bonus accrued and the cumulative draws for 1993. (This is why each of the draws was in payment of an antecedent debt, one of the prerequisites for the existence of a preference.) Moreover, the draw payments lagged far behind the bonus debt that was accruing. For example, by July 7, 1993, when the first of the four draws at issue was made, Pillard had earned $56,420.00 in personal consulting bonus and was still owed $38,088.50 of that amount. The draw of $1,666.50 on July 7 and the three later draws were not intended to be a contemporaneous exchanges for new value but partial payments of the cumulative bonus that had been accruing.

There is no evidence that the parties intended the $1,666.50 draw payments to be applied first to the bonus generated during the pay period for which Pillard received a compensation check. Pillard was entitled to make a draw even if he generated no bonus in the pay period. Indeed, one of the draw payments (the one made on August 6, 1993) was made for a half-month period for which the evidence fails to establish that any bonus was generated. Accordingly, the court concludes that the exception of § 547(c)(1) does not apply.

### B.

■ Under 11 U.S.C. § 547(c)(2) the trustee may not avoid a transfer that was

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms;

Pillard's bonus plan for May 1992 through August 1993 (when his employment was terminated) was adopted in the ordinary course of the business and financial affairs of the company and Pillard. Bonuses were a common compensation element for officers and senior management. As discussed with respect to the fraudulent conveyance issue decided at trial, although Pillard's bonus on paper may appear to be foolish from the company's perspective, it must be borne in mind that Pillard was previously being compensated at an annual base salary of $140,000 and a guaranteed bonus of at least $50,000 during his first year of employment by the company, 1991. The new bonus package gave Pillard a base salary of only $100,000 and a bonus of 50% on any personal consulting revenues up to $100,000 plus 30% of such revenues over $100,000. There was a line of business bonus for the performance of Pillard's entire consulting unit, but it was only a 5% bonus and was to be reduced dollar for dollar by negative contribution. Viewing the new bonus terms as part of the entire compensation package, Pillard's compensation terms were not so generous as to remove the bonus terms from the realm of being adopted in the ordinary course of the company's business.

Once the new bonus terms were adopted, the bonus debt accrued as Pillard and his unit brought in revenues. Because the bonus accrued incident to a plan adopted in the ordinary course of the company's business and Pillard's financial affairs, it follows that it was incurred in such ordinary course as well. Accordingly, § 547(c)(2)(A) has been met.

Pillard's bonus draws in both 1992 and 1993 were paid in the ordinary course of the affairs between the company and Pillard. The draws came like clock-work and started

before the commencement of the one-year period preceding the filing of the debtors' bankruptcy petitions. (The same cannot be said about the three non-draw payments of 1992 bonus which were expressly deferred because of tight cash flow.) Because compensation for all employees was generally coming like clock-work, there is no suggestion that Pillard was, in bad faith, being singled out for favorable treatment. Although other creditors, particularly the IRS and Banyan, were not being paid on a current basis, this variance does not make § 547(c)(2)(B) inapplicable. *See In re Tax Reduction Institute,* 148 B.R. 63, 73–74 (Bankr.D.D.C.1992) (no bad faith present and "Congress has not seen fit to penalize the creditor kept more current"). The use of draws to partially pay the likely bonus of corporate officers and higher management was not an unusual practice within the company. Although lower-salaried employees were paid bonus on a quarterly basis, Pillard's general deferral of bonus to year-end with partial draws in the interim was not unusual within the company and, if anything, put him on a less favorable footing. For all of these reasons, the court concludes that Pillard has met § 547(c)(2)(B).

Finally, the draws were all paid according to ordinary business terms. Although the court heard exceedingly weak evidence of the ordinary payment terms prevailing in the entire industry, the court is satisfied from Pillard's work experience at other firms and the offers he received from other firms that the bonus draws were paid according to ordinary business terms. Bonuses are paid by well established companies in the industry on a monthly, quarterly or yearly basis. It follows that a bonus plan finally calculated at year-end and partially payable by way of a set draw amount on each of the two pay periods in a month is not so at variance with the range of payment terms prevailing in the industry such as to be non-ordinary business terms. As stated in *In re Tolona Pizza Products Corp.,* 3 F.3d 1029, 1033 (7th Cir. 1993), " 'ordinary business terms' refers to

the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and ... only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C." [Citations omitted; emphasis in original.] *Accord, In re Molded Acoustical Products, Inc.,* 18 F.3d 217, 224 (3d Cir.1994) (substituting "unusual" for "idiosyncratic"); *Advo–System, Inc. v. Maxway Corp.,* 37 F.3d 1044 (4th Cir.1994). In other words, the court is not required to find a single industry norm. As Pillard's testimony demonstrated, the structure of bonus plans and their timing of payment are varied in the industry and the court cannot find the payment of his bonus in draws to be so at variance with other payment terms prevailing in the industry as to be unusual and hence not ordinary under § 547(c)(2)(C). As the court held in *Molded Acoustical,* 18 F.3d at 226, even in the absence of a longstanding payment practice between the parties pre-dating the debtor's financial difficulties, "departures from [the] relevant industry's norms which are not so flagrant as to be 'unusual' remain within subsection C's protection." The court in *Molded Acoustical* went on to state, *id.,* that:

[W]e read subsection C as establishing a requirement that a creditor prove that the debtor made its pre-petition preferential transfers in harmony with the range of terms prevailing as some relevant industry's norms. That is, subsection C allows the creditor considerable latitude in defining that the relevant industry is, and even departures from that relevant industry's norms which are not so flagrant as to be "unusual" remain within subsection C's protection.

*Molded Acoustical* makes clear, and the court agrees, that the focus of subsection C is whether the payment was on terms unusual against the background of what happens elsewhere in the industry, not whether it is precisely matched by the payment practice of another company in the industry.[6] Accord-

---

**6.** That the debtor and Pillard engaged in this course since April of 1992 certainly does not hurt Pillard's case. *Molded Acoustical* views such a

longstanding practice substantially pre-dating the debtor's insolvency and financial problems as a basis for relaxing the showing a creditor must

ingly, this record just barely allows the court to conclude that subsection C applies.[7]

In sum, § 547(c)(2) fully protects the bonus draws in the 90–day period preceding the bankruptcy filing.

### C.

■ Even if § 547(c)(2) did not protect the bonus draws, 11 U.S.C. § 547(c)(4) would provide Pillard protection as to $180.00 of the transfers. Under § 547(c)(4) the trustee may not avoid under § 547 a transfer:

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor; ....

Pillard's services, at the compensation contracted for between the parties, constituted new value every time he performed new services. The plaintiffs point to Pillard's regular salary compensation as an unavoidable transfer for the new value Pillard was imparting to the company and argue that § 547(c)(4)(B) has thus not been met by Pillard. But the value Pillard was granting was greater than just the base salary. The value of his services also included a bonus component. Thus, in applying the new value exception of § 547(c)(4) any unpaid bonus compensation for new work performed must be taken into account.

The parties have stipulated that on July 7, 1993, Pillard received a $1,666.50 draw and that for the period July 1–15, 1993, he recorded $15,250.00 in new billings entitling him to $4,575.00 in new bonus. However, there is no evidence as to when during July these new billings were made. For the period July 15–31, 1993, Pillard recorded $600.00 in new billings entitling him to $180.00 in new bonus. The bonus computation is the 30 percent agreed to for personal consulting revenues over $100,000 and does not include any line of business bonus. Pillard testified that the line of business bonus owed for $162,814.80 in revenues for July 1993 was five percent of those revenues or $8,140.74. However, Pillard did not introduce the spread sheets listing these revenues and it is not possible to tell whether the revenues were achieved in any part after July 7, 1993. On July 22, August 6, and August 22, 1993, Pillard received three more draws of $1,666.50 each, but there is no evidence of Pillard performing uncompensated work after any of those payments.

Pillard had the burden of proving the applicability of § 547(c)(4). On this record, he has only proven that after the July 7th payment of $1,666.50 he became entitled to a bonus of $180.00. Although it is possible that part of the $15,250 in personal consulting revenues for the period July 1–15 and part of the $162,814.80 in line of business revenues for the month of July 1993 were realized after the July 7th payment, the court cannot speculate in that regard. Accordingly, as to draws in the 90–day period, Pillard established only that $180.00 of the $4,666.00

make under subsection C. *Id.* A longstanding practice may be of some probative weight, because businesses do not ordinarily engage in non-ordinary terms absent some explanation (such as fear of insolvency or an insider relationship). But it is unclear from the evidence whether the company here was insolvent from the outset of its new plan for paying bonus to Pillard partially in draws. Accordingly, even under *Molded Acoustical* the 16–month practice between Pillard and the company is probably not of any evidentiary weight.

7. In addressing when an established practice allows a greater leeway in applying subsection C, the Third Circuit in *Molded Acoustical* also focused on whether the practice remained relative-

ly consistent after the debtor became insolvent and whether the creditor brought to bear any pressure for payment to be made. For what it is worth, the court notes that Pillard did not appear to know that the company was insolvent and was not the one who put in place the new compensation package—Dramis did it unilaterally. This type of evidence appears more germane to subsection B by demonstrating that Pillard did not exert pressure on the company in light of concerns about its insolvency. At most, for subsection C purposes, it negates a possible basis for not applying a relaxed standard in determining whether the payment plan was unusual; it does not affirmatively prove that it was not unusual.

of draws at issue come within the new value exception of § 547(c)(4).

### Conclusion

Pillard's bonus plan payments were not a fraudulent conveyance. As to the preference claims, Pillard was not an officer or otherwise an insider and hence is liable only for preferential transfers in the 90 days preceding the bankruptcy case filings. None of the challenged payments in that 90 days can be set aside as a preference because the ordinary course of business exception of § 547(c)(2) applies, although that is a close call. Accordingly, judgment must be entered in Pillard's favor.[8]

---

8. Even if § 547(c)(2) did not apply, Pillard's exposure would be only $4,486.00: of the $6,666.00 in challenged payments in the non-insider preference period, $180.00 is protected by the new value exception of § 547(c)(4) and $2,000 does not constitute a preference because Pillard would have had a priority claim for that amount and the evidence did not show an inability of the estate to pay that sum in a chapter 7 liquidation.