In re LABRUM & DOAK, LLP, Debtor.

OFFICIAL COMMITTEE OF FORMER PARTNERS, Plaintiff,

and Official Committee of Unsecured Creditors, Intervening Plaintiff,

v.

Michael G. BRENNAN, et al., Defendants.

Bankruptcy No. 98–10215DAS.
Adversary No. 98–0393.

United States Bankruptcy Court,
E.D. Pennsylvania,
Philadelphia Division.

Nov. 19, 1998.

Neal Colton, Philadelphia, PA, for debtor.

Paul J. Winterhalter, Philadelphia, PA, for Official Committee of Former Partners.

Aris Karalis, Ciardi, Maschmeyer & Karalis, P.C., Philadelphia, PA, for Official Committee of Unsecured Creditors.

Robert Lapowsky, Wayne, PA, for Parsells, Carr, Neeson, Springer, and Salmon.

Robert Szwajkos, Fox, Rothschild, O'Brien & Frankel, Philadelphia, PA, for Barbara Hollenbach.

Michael Menkowitz, Fox, Rothschild, O'Brien & Frankel, Philadelphia, PA, for Kean McDonald.

Gary Bressler, Pelino & Lentz, PC, Philadelphia, Pa, for John Lucey.

James E. O'Neill, III, Stradley, Ronon, Stevens & Young, Philadelphia, PA, for Robert Stern.

Howard Cyr, Harvey, Pennington, Herting & Renneisen, Ltd., Philadelphia, PA, for Leslie Cyr.

Robert J. LaRocca, Philadelphia, Pa, for Ryan Brown Firm.

Frederic Baker, Ass't U.S. Trustee, Philadelphia, PA, for United States Trustee.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

The instant adversary proceeding ("the Proceeding") is an action brought by the Official Committee of Former Partners ("the PF Committee") of a dissolved law firm which is a chapter 11 debtor, LABRUM & DOAK, LLP ("the Debtor"), joined by the intervening Official Committee of Unsecured Creditors ("the UC Committee;" with the FP Committee, "the Plaintiffs"). Therein, the Plaintiffs seek to avoid distributions made by the Debtor to its partners within one year before the commencement of the Debtor's bankruptcy case, pursuant to 11 U.S.C. §§ 547(b) and 548(b). Proof of the Debtor's insolvency, which is a necessary element of claims under both of these statutes, is dependent upon our accepting the balance sheet calculations of the Plaintiffs' expert accountant. These calculations designated the entire amount of the Debtor's "contingent lease payables," principally regarding leases which were to extend for many years after the Debtor's dissolution, as liabilities. Since we cannot accept this calculation as a reasonable estimate of actual indebtedness for these obligations, we find that the Plaintiffs have not met their burden of proving the Debtor's insolvency. Accordingly, judgment will be entered against the Plaintiffs.

### B. FACTUAL AND PROCEDURAL HISTORY

As we noted in our very recent Opinion of November 13, 1998, approving, for the most part, a Chapter 11 plan submitted by the UC Committee in this case ("the Confirmation Opinion"), this case has been "contentious" and marked by a significant volume of litigation. The Opinions published in the Bankruptcy Reporter to date include a decision of

August 14, 1998, allowing the Debtor to obtain a *quantum meruit* recovery of the fees ultimately received by its former attorneys who took contingent-fee cases with them, at 225 B.R. 93 ("the August Opinion"); and a decision of July 30, 1998, allocating tax recapture liability arising from the lease of the Debtor's Philadelphia office among its former as well as its present partners, at 222 B.R. 749 ("the July Opinion"). To be published in Bankruptcy Reporter in addition are a Supplement to the August Opinion fixing the Debtor's share of the contingent fees, presently reported only at 226 B.R. 161; and the Confirmation Opinion, too recent to be published anywhere.

The genesis of this particular Proceeding was a motion filed by the FP Committee on June 1, 1998, seeking permission to file this suit in light of the reluctance of the Debtor to institute it. On July 8, 1998, that motion was granted and the Complaint was filed on July 15, 1998. After a consensual continuance of the original trial date of September 2, 1998, to October 14, 1998, the Proceeding was tried on the latter date. The UC Committee was granted permission to intervene in the Proceeding as a party plaintiff on the date of trial.

We note the Proceeding was mentioned briefly in the July Opinion as a potential vehicle for the former partners to recover for alleged depletion of the Debtor's tax reserve accounts by the present partners. 222 B.R. at 753, 762. However, that depletion was not in fact referenced in any sense in this litigation and it was therefore not utilized in this capacity.

Named as Defendants in the Proceeding were twenty-four (24) attorneys who allegedly received distributions as partners of the Debtor within a year of the involuntary petition which commenced this case on January 6, 1998. The payments included 1996 income distributions in early 1997 ranging from below $10,000 to more than $100,000 per partner, plus periodic 1997 income distributions between January 1997 and May 1997, usually in amounts of $1000 and $1923.08. Total distributions to "full" partners ranged from $23,076.96 (Defendant BLANCK) to $231,

$175.37 (Defendant SALMON). Most were clustered around $100,000.

Five so-called "equity partners," Defendants BROWN, CAROLAN, GREYSTONE, JORDAN, and TOBIN, were voluntarily dismissed as parties prior to the commencement of the trial. It is reported that Defendants BRENNAN, ESTRIN, GRACE, HAUSCH, RITCHIE, and CARR filed personal bankruptcies of their own prior to trial, resulting in a stay of the Proceeding as to them. All of the other Defendants answered the Complaint. Several Defendants, notably the equity partners since dismissed from the case, filed Cross-claims against others. Defendants CYR, HOLLENBACH, LUCEY, McDONALD, and STERN testified at trial.

Witnesses called by the Plaintiffs included retired partner Daniel J. Ryan and withdrawn partner Jonathan D. Herbst; Anthony Calascibetta, whose firm, Kahn Consulting, Inc. ("KCI"), collected data pertaining to the partners' individual financial circumstances as of June 1998; J. Daniel Jones, the Debtor's accountant; and Stephen Scherf, the Plaintiffs' expert accountant. The Defendants called, in addition to the five of their number named above, Joseph Klein, the Debtor's former controller; and Diane Strack, the Debtor's "dissolution administrator." They did not call an expert in response to Scherf. Upon the completion of the trial, which consumed about eight hours, the parties were accorded until October 28, 1998 (the Plaintiffs), and November 4, 1998 (the Defendants), to render post-trial submissions.

Calascibetta testified that the KCI report indicated that the Debtor's partners had total net assets of but $41,000. Jones was called mostly to identify certain documents, although, to the surprise of the Plaintiffs, it was brought out in cross-examination that he had performed a draft solvency analysis for the Debtor in May 1998 which recited that the Debtor had assets of $8,405,699 and liabilities of only $4,815,168 and hence was comfortably solvent as of January 31, 1997, as well as of December 31, 1996. Scherf, meanwhile, recorded a liability of $14,025,707 on account of the Debtor's future lease obligations as of December 31, 1996, which was

decreased only to $13,537,849 as of May 1997. While Scherf was unable to break this figure down, he stated that it was the sum of all past and future rentals due on the Debtor's leased office spaces in Philadelphia, West Chester, Norristown, and Bethlehem, PA; Mt. Laurel, NJ; and New York City, plus rentals due on equipment leases. Scherf's asset valuation ranged from nearly $10 million on December 31, 1996 to slightly less than $8.9 million in May 1997, while liabilities other than future rents ranged from about $3.1 million on December 31, 1996, to about $4.4 million in May 1997. In his analysis, Jones, upon instructions from the Debtor's counsel on this point, had measured the Debtor's lease obligations by the amount of current rental payments due for a period of one year, stated as $850,000.

Klein testified that the Debtor at all times paid all of its obligations as they came due, with the exception of retirement or withdrawal obligations to former partners, which ceased in early 1997. Strack's records indicated fees billed by all of the Debtor's partners for the period from January through July 1997, which were far in excess of the distributions paid. McDonald testified that the Debtor had not drawn at all on an available $3 million line of credit as of February 14, 1997, the time that he resigned as a partner of the Debtor. Hollenbach testified to her successful negotiations to trade to the Bethlehem office landlord certain furniture on location in exchange for elimination of any future rent payments due. All of the Defendants credibly testified that they believed that the Debtor was solvent at all times prior to its dissolution and that they performed services through July 31, 1997, worth considerably more than the distributions which they received, which ceased in May 1997.

The witnesses other than the Defendants were likewise credible. However, it became obvious that a critical aspect of the Plaintiffs' case was whether Scherf, though acting in good faith, was in fact correct in calculating all of the Debtor's substantial total future rent obligations as present liabilities of the Debtor.

*C. DISCUSSION: THE DEBTOR'S FUTURE RENT OBLIGATIONS SHOULD NOT BE CALCULATED AS LIABILITIES, RENDERING THE PLAINTIFFS' UNABLE TO PROVE THE DEBTOR'S INSOLVENCY AS OF THE TIMES OF THE TRANSFERS AT ISSUE.*

The principal statutory basis of the Plaintiffs' case is 11 U.S.C. § 548(b), which thusly allows the avoidance, as a "constructive" fraudulent conveyance, of transfers to partners by a debtor partnership:

(b) The trustee of a partnership debtor may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, to a general partner in the debtor, if the debtor was insolvent on the date such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.

Their secondary statutory ground is 11 U.S.C. § 547(b), which thusly permits avoidance of certain preferential transfers:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Our attempt to uncover all cases which have interpreted § 548(b) yielded · but *one* case, *In re 1634 Associates,* 157 B.R. 231, 233–34 (Bankr.S.D.N.Y.1993) (holding that transfers resulting in "indirect" as well as "direct" benefit to partners are covered by this Code section). An issue potentially critical to resolution of the Proceeding, the interrelationship of 11 U.S.C. §§ 548(b) and 548(c), is not addressed in the caselaw. .

The discussion of this issue in 5 COLLIER ON BANKRUPTCY, ¶ 548.07 (15th ed. rev. 1998), which does not cite any supporting cases, does not totally settle this issue. On one hand, it states, *id.,* at 548–71, that "[t]he only factor that the trustee must prove, beyond the fact that a transfer was indeed made, or that an obligation was in fact incurred, is that the partnership was insolvent at the time of or as a result of the transfer." This statement suggests, as the Plaintiffs argue, that the value given and good faith of the partner-transferee is irrelevant. On the other hand, of 11 U.S.C. § 548(c), which provides that

a transferee or ... that takes for value and in good faith has a lien on or may retain any interest transferred ... to the extent that such transferee ... gave value to the debtor in exchange for such transfer or obligation,

it states, on the next page, that a § 548(b) transferee may "be established as a good faith transferee for value under Section 548(c)." *Id.* at 548–72. *See* also *id.* at 548–76 (implicitly indicating that the "good faith" "saving clause" in § 548(c) *is* applicable to a transfer pursuant to 548(b)). If satisfaction of the conditions of § 548(c) does provide a defense to a § 548(b) transfer, which appears to be the case, it would seem that the Defendants meet the § 548(c) requirements of accepting the distributions in good faith; having a lack of knowledge of any insolvency of the Debtors; and having given more than sufficient value in exchange for the distributions received.

As to § 547(b), a significant issue exists as to whether the distributions, which are in the nature of installment payments of compensation for services performed, could be considered to be made on account of "antecedent debt" owed by the Debtor to the Defendants, as required by § 547(b)(2). We know of no case holding that salaries paid to employees as work is performed, as these payments were in substance, are transfers subject to avoidance as preferences. In addition, viable affirmative defenses appear to lie under 11 U.S.C. §§ 547(c)(1) and (c)(2). *See In re Molded Acoustical Products, Inc.,* 18 F.3d 217, 224–26 (3d Cir.1994) (payments made pursuant to longstanding practice between the parties which are not contrary to industry norms are within § 547(c)(2)); and *In re Spada,* 903 F.2d 971, 975 (3d Cir.1990) (contemporaneous exchange within 547(c)(1) occurs when the parties both intend, and in fact do, effect a contemporaneous exchange). *See generally In re NMI Systems, Inc.,* 179 B.R. 357, 372–74 (Bankr.D.D.C.1995) (§§ 547(c)(1) and (c)(2) defenses lie to an action seeking to recover wages paid to the debtor's President as a preference).

However assuming *arguendo* that the payments in issue are found otherwise within the scope of these Code sections, both § 548(b) and 547(b)(3) require the Plaintiffs to satisfy the burden of proving that the Debtor was "insolvent" at the time of the transfers, between January 7, 1997, and May 1997. As both parties and this court recognize, the Bankruptcy Code test for insolvency is

"a 'financial condition such that the sum of such entity's debts is greater than all of such entity's property, at fair valuation,' exclusive of property exempted under § 522 of the Code or fraudulently transferred. 11 U.S.C. § 101.31[1], at 101–74 [ (2d ed.1989) ]. The Code requires the use of a 'balance sheet' test for insolvency, comparing assets to debts. [*In re*] *Pinto,* ... 98 B.R. 200, 209 [ (Bankr.E.D.Pa.), *rev'd on other grounds sub nom. Pinto v. Philadelphia Fresh Food Terminal Corp.,* 1989 WL 234516 (E.D.Pa. Aug. 25, 1989) ]; *In re Art Shirt Ltd.,* 68 B.R. 316, 322 (Bankr.E.D.Pa.1986), *aff'd,* 93 B.R. 333 (E.D.Pa.1988); and *In re Corbett,* 80 B.R. 32, 37–38 (Bankr.E.D.Pa.1987)."

*In re Martin's Aquarium, Inc.*, 225 B.R. 868, 876–77 (Bankr.E.D.Pa.1998), quoting *In re Joshua Slocum, Ltd.*, 103 B.R. 610, 621 (Bankr.E.D.Pa.), *aff'd*, 121 B.R. 442 (E.D.Pa. 1989).

Since the burden is upon the Plaintiffs to prove insolvency, they can to prevail only if they can support Scherf's position that all of the Debtor's future rents—or at least $4.5 million of that total figure—are properly considered as a liability of the Debtor. We arrive at the $4.5 million by assuming that all of Scherf's figures other than his deduction for "contingent lease payables" are accurate and by observing that, at the "low point" of the Debtor's solvency, per Scherf, on May 8, 1997, the Debtor's assets exceeded their other liabilities by about $4.5 million. *See* page 386 *supra.* We note that we are forced to focus solely on Scherf's analysis because the Defendants, somewhat surprisingly in light of their large array of witnesses, did not call a counter-expert on the insolvency issue. Of course, the absence of an expert is not fatal to their case if we cannot accept the conclusions posited by the Plaintiffs' expert. It simply makes our job more difficult.

The cases cited by the Plaintiffs in support of Scherf's analysis are, not surprisingly, few in number. Their principal authority, which Scherf, though a non-lawyer, repeatedly invoked at trial himself in support of his analysis, is *In re Trans World Airlines, Inc.*, 134 F.3d 188, 196–98 (3d Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 1843, 140 L.Ed.2d 1093 (1998) ("*TWA*"). They also briefly cited to *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 648 (3rd Cir.1991); and *In re R.M.L.*, 187 B.R. 455, 464 (Bankr. M.D.Pa.1995), *aff'd*, 92 F.3d 139 (3d Cir. 1996), for the uncontroversial principles that "fair valuation" of assets involves a "balance sheet test," and that generally accepted accounting principles (GAAP) or standards (GAAS) are not conclusive in an insolvency analysis, respectively.

In *TWA*, in speaking of the valuation of the debtor's publicly-traded debt, the court initially held that it must consider the "face value" rather than the reduced "market value" of those assets. 134 F.3d at 196–97. Thus, particularly when the debtor is a "go-ing concern," as was the instant Debtor at the time of the transfers at issue, a debtor's obligations should not be adjusted downward for considerations which might reduce the value of claims in the bankruptcy context, such as a realization by the claimant that the debtor's assets available for distribution are scarce or that a specific Code provision, such as the 11 U.S.C. § 502(b)(6) cap on the instant future rent claims, might reduce the amount of the claims.

Second, the court held that it was appropriate to consider contingent liabilities of the debtor which might arise if the debtor, though presently a going concern, did cease operations. *Id.* at 197. In that connection, the *TWA* court held that, while

> it is proper to consider contingent liabilities when evaluating the insolvency of a corporation pursuant to 11 U.S.C. § 101(32)(A), *see Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors (In re R.M.L., Inc.)*, 92 F.3d 139, 156 (3d Cir. 1996); *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir.1988); *Syracuse Engineering Co. v. Haight*, 97 F.2d 573, 576 (2d Cir.1938) (L. Hand, J.), . . . we cannot agree that costs associated with the dissolution of the debtor can be included under that rubric. Indeed, it is the antithesis of a "going concern" valuation to include such costs. See 2 Collier on Bankruptcy § 101.32[4] at 101–116 (15th ed. Rev.1997) ("There is overwhelming authority to the effect that . . . subsequent dismemberment . . . should not enter into the picture.") (citing cases). Rather, contingent liabilities must be limited to costs arising from foreseeable events that might occur while the debtor remains a going concern. *See FDIC v. Bell*, 106 F.3d 258, 264 (8th Cir.1997) . . . .

The foregoing analysis is the slim reed upon which the Plaintiffs seek to base their argument that all of the Debtor's future rent claims must be counted as liabilities in a bankruptcy insolvency analysis. However, we find the Plaintiffs' position counterintuitive. If a debtor's future rents can be counted as liabilities, it would seem that all projectable costs of doing business in the future could be counted as liabilities. In the context of

the Debtor law firm, future compensation to partners might as easily be counted as liabilities as future rents. In the case of a debtor-manufacturer, we might as well consider its projected purchases of raw materials as liabilities. It is plain to see that, under this sort of analysis, no business which had projectable costs going forward could ever be determined to be solvent. It is also clear that simply because a debtor is able to project debts which fall due in the future should not render that debtor's liabilities as the equivalent at present due obligations countable as current liabilities. As the Defendants argue, if such liabilities are carried forward, it is only fair that allowances be made for the value of the Debtor's future leaseholds. However, Scherf offers no such allowances and simply counts all of the future rents due as liabilities, without any adjustments.

■ As *TWA* holds, while contingent liabilities can indeed be considered in computing a debtor's solvency balance sheet, their valuation must be measured done most carefully. Such a liability must be "reduced . . . to its expected amount before a determination on insolvency can be made." *In re Sierra Steel Inc.*, 96 B.R. 275, 279 (9th Cir. BAP 1989). *Accord, Bell, supra,* 106 F.3d at 264; *Xonics, supra,* 841 F.2d at 200; and *In Re Parker Steel Co.,* 149 B.R. 834, 842 (Bankr.N.D.Ohio 1992).

■ In light of these consideration, we find it far more logical *not* to count the Debtor's entire contingent future rent liability in an insolvency analysis then to count it at all. We hasten to add that this is not because the contingency of the Debtor's going out of business, forfeiting possession, and being relieved from the future obligation by negotiated settlements or operation of law was likely. Indeed, the Defendants testified that, at the time that they received their distribution payments, they believed that the Debtor was solvent and would remain in business. Apparently no threat to the Debtor's continuity arose until sometime after McDonald left the Debtor on February 14, 1997, and Neeson, Salmon, and Springer, assessing the Debtor's prospects in future years over the next two or three months, decided that they would leave the firm. At

that point only was the Debtor's dissolution rendered likely if not inevitable.

Rather, it is logical not to include all of the future rents as liabilities because this calculation miscategorizes the future rent liability as an obligation presently due in full, while, if the Debtor remained a going concern, would have consisted of making installment payments in the future during the tenancy. Again, if accounting to render all future rents immediately payable could be done as to rent, it could be so done with respect to any projectable future expense. Again, this would render any business with substantial projectable future expenses artificially deemed insolvent.

■ We find numerous indicia in the record that Scherf's accounting technique utilized here was most unorthodox, and hence unacceptable. First, as Scherf conceded, his calculations were not in conformity with GAAP principles. While we recognize and concur that GAAP principles are not controlling in insolvency analyses, we also recognize that, when an accountant leaves behind the standards of his profession, additional scrutiny is necessary. Thus, actions taken by accountants in an insolvency analysis which are contrary to GAAP principles should be eminently logical and supportable as an exception for good cause. It will not do to abandon GAAP principles to illogically embrace whatever "voodoo economics" an accountant can conjure.

Secondly, the Plaintiffs are unable to cite any case in which any future rent obligations were included as a liability in an insolvency analysis. Since rent is a common liability owed by many debtors, we can infer from the absence of authority that either Scherf's position has been so readily accepted that it has been adopted without discussion by many courts, or that it is so beyond the pale of acceptance that no one has ever attempted to argue it before. The Defendants cite *In re Davis,* 120 B.R. 823, 825–26 (Bankr.W.D.Pa. 1990), in which Judge Bentz, without considering the imposition of a greater liability for this purpose, included *one additional* month's future rent as the sole liability counted against the debtor's balance sheet in

an insolvency analysis. This citation suggest that the latter inference, *i.e.,* that Scherf's reasoning is plainly unacceptable, is more than likely to be the case.

The Debtor's own analysis of its solvency also suggests that Scherf's analysis is not normative. The Debtor's amended Schedules list liabilities of $5,365,584.14 against assets of $8,178,303.58. While not conclusive, we are hard-pressed to understand why a debtor would overstate its solvency on its Schedules, thus constricting its own use of its avoidance powers. While again not conclusive, the use by the Debtor's counsel of one year's rent in instructing Jones in the preparation of his solvency analysis and Jones' conclusion that the Debtor is highly solvent on the basis of this logical assumption as to the maximum properly-includable future rent liability is instructive. Also in the record is a draft of the Debtor's Statement of Assets and Liabilities as of December 31, 1996, prepared by Jones, which reflects Total Current Assets of $3,232,382 and Total Current Liabilities of $413,617.

We also note that even the landlords themselves, obviously motivated to maximize their own claims, have not asserted claims approaching $14 million. The Mt. Laurel landlord, whose lease extended to 2005 and whose future rents Scherf presumably calculated through that date, filed a claim in the amount of $3,785,153.00. The Philadelphia landlord whose lease extended through 2002, *see* the July Opinion, 222 B.R. at 753–54, and which Scherf presumably calculated through *that* date, totals $2,215,488.62. As far as we can determine, no other claims for future rents were filed.

Finally, the Disclosure Statement prepared by the UC Committee in support if its plan of reorganization, addressed in the Confirmation Opinion of November 13, 1998, notes that settlements were effected with all of the landlords except those in Philadelphia and New Jersey. While it references "significant" claims of these landlords, the figures recited are in the $2 million range, *not* that of $14 million.

The parties recognize, as we indicated in *In re Union Meeting Partners,* 163 B.R. 229, 239–40 (Bankr.E.D.Pa.1994), that the net assets of the Debtor's partners must also be considered in determining whether the Debtor's liabilities exceed its assets. *See also* 7 COLLIER, *supra,* ¶ 548.08, at 548–71. The Plaintiffs attempt to satisfy this requirement by the use of the KCI report. The Defendants argue that the critical period for measurement of the partners' net assets is not June 1998, the date at which the KCI report measured the partners' assets, but over a year earlier, from January through May 1997. The Defendants are correct in asserting that the KCI report is therefore not conclusive on this issue as well.

We again note that the Plaintiffs have not made any claims based on the theory that the Defendants in any way improperly depleted the Debtor's tax reserve funds, *see* page 385 *supra,* and the July Opinion referenced therein at 222 B.R. at 753, 762. Rather, the only claims set forth in the Complaint were a constructive fraudulent conveyance claim and a preference claim. Both of these claims are Bankruptcy Code claims which seek to avoid transactions which are in no sense improper or inequitable, but simply further the bankruptcy scheme of providing for an equal distribution of scarce assets. Both of these claims nevertheless indisputably require proof that the Debtor was insolvent at the time of the distributions at issue. Since we conclude that the Plaintiffs had not met their burden of proving that the Debtor *was* insolvent at those critical times, judgment must accordingly be entered in favor of the Defendants as to all claims asserted.

We note that the Chapter 11 plan which the November Opinion found likely to be confirmable will give the UC Committee the right to pursue deficiency claims against the partners. Such claims appear a more equitable medium to render the partners liable then the most doubtful claims asserted in the Proceeding.

## D. CONCLUSION

An order dismissing the Complaint in the Proceeding will accordingly be entered.

### ORDER

AND NOW, this 19th day of November, 1998, after a trial of the above-captioned

proceeding ("the Proceeding") on October 14, 1998, and upon consideration of the parties' respective post-trial submissions, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of the Defendants and against the Plaintiffs in this Proceeding.

2. The Complaint is DISMISSED.

3. All Cross-claims asserted by certain of the Defendants against other of the Defendants are DISMISSED as moot in light of our foregoing disposition on the main claims in the Proceeding.

sells, Jan M. Ritchie, Daniel J. Ryan, John E. Salmon, Paul M. Silver, Stephen J. Springer, Robert J. Stern, Pamela Tobin, Ronald J. Uzdavinis, Patrick R. Vitullo, John L. White, Merle A. Wolfson, Defendants.

Bankruptcy No. 98–10215DAS.
Adversary No. 98–0273.

United States Bankruptcy Court,
E.D. Pennsylvania,
Philadelphia Division.

Dec. 4, 1998.