# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

_____

No. 07-6034NE
No. 07-6035NE

_____

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| Prime Realty, Inc., | * | |
| | * | |
| | * | |
| Debtor. | * | |
| | * | |
| James Killips, Chapter 11 Trustee, | * | |
| | * | |
| Plaintiff-Appellants, | * | Appeal from the United States |
| | * | Bankruptcy Court for the |
| v. | * | District of Nebraska |
| | * | |
| Robert C. Schropp, | * | |
| RCS Sons, Inc., and Leo Dahlke | * | |
| | * | |
| | * | |
| Defendants–Appellees. | * | |

_____

Submitted: October 24, 2007
Filed: December 27, 2007

_____

Before KRESSEL, Chief Judge, SCHERMER and McDONALD, Bankruptcy Judges.

_____

McDONALD, Bankruptcy Judge

James Killips, the Chapter 11 Trustee of Debtor Prime Realty, appeals from the judgment of the bankruptcy court[1] in favor of Defendants on Trustee's preference and fraudulent conveyance claims. We affirm.

I.

Debtor, Prime Realty, Inc. ("Prime"), was involved in several joint ventures with Leo Dahlke and RCS & Sons, Inc. ("RCS"). The primary purpose of these joint ventures was to purchase and develop real property (the "Real Property"). Robert C. Schropp was the sole shareholder of RCS.

The joint ventures were primarily in the form of limited partnership, with Prime as the general partner (collectively the "Partnerships"). The Partnerships began experiencing cash flow problems in 2000. James McCart, Prime's President and CEO, created a plan to address the Partnerships' liquidity issues (the "Plan"). Under the Plan, RCS and Dahlke agreed to obtain loans from Nebraska State Bank totaling approximately $2,072,000.00 (collectively the "Loans"). Nebraska State Bank would provide the proceeds of the Loans directly to Prime. Prime in return would repay the Loans directly to Nebraska State Bank over a twelve month period and indemnify RCS and Dahlke from any liability on the Loans.

Finally, as part of the Plan, Prime agree to purchase the interest of both RCS and Dahlke in the Partnerships. This portion of the Plan required Prime to remit

---

[1] The Honorable Timothy J. Mahoney, Chief Judge, United States Bankruptcy Court for the District of Nebraska.

$232,000.00 to both RCS and Dahlke upon receipt of the proceeds of the Loans. Prime was then to make monthly payments of $20,000.00 to RCS and $15,000.00 to Dahlke for a term of one year (the "Monthly Payments"). Under the terms of the Plan, RCS and Dahlke would transfer their interests in the Partnerships to Prime upon Prime's completion of its obligation to remit the Monthly Payments.

Both RCS and Dahlke entered into "Purchase Contracts" with Prime dated March 6, 2001 that memorialized the above outlined terms of the Plan. RCS and Dahlke then executed the promissory notes in favor of the Nebraska State Bank on April 12, 2001 pursuant to the Plan. The documents prepared by Nebraska State Bank confirm that it remitted approximately $2,100,000.00 in proceeds from the Loans directly to Prime. It is unclear from the evidentiary record how Prime disposed of these proceeds.

Pursuant to the terms of the Plan, Prime immediately paid the initial $232,000.00 to both RCS and Dahlke as required by the Purchase Contracts. Prime additionally made the Monthly Payments to both RCS and Dahlke for April, May and June. Prime transferred a total of $313,682.45 to RCS and $293,682.45 to Dahlke in April, May, June and July 2001 (collectively the "Transfers").

Prime, however, failed to make any payments on the Promissory Notes to Nebraska State Bank as required by the Plan. Prime also failed to remit any additional Monthly Payments on the Purchase Contracts to either RCS or Dahlke after July 1, 2001. Therefore neither RCS nor Dahlke transferred their interest in the Partnerships to Prime as contemplated by the Purchase Contracts.

The relationship between McCart and Schropp and Dahlke quickly deteriorated after Prime stopped making the Monthly Payments. The FBI also began to investigate McCart sometime in the summer of 2001 for his part in a check kiting scheme. When Schropp and Dehlke learned of the FBI investigation, they refused to contribute any additional capital to the Partnerships or guaranty any additional loans for the benefit of the Partnerships. Without the ability to obtain additional liquidity, the Partnerships defaulted on several existing loans that were secured by the Real Property.

Prime and McCart then filed a tortuous interference with a business expectancy action against Schropp and Dahlke in Nebraska state court (the "State Court Action"). The basis for Prime's State Court Action was that Schropp and Dahlke intentionally and wrongfully caused the Partnerships to default on several loans with Nebraska State Bank by refusing to guaranty the Partnerships' obligations on additional loans. Schropp and Dahlke filed an answer to the State Court Action arguing, *inter alia*, that McCart had deceived them about the financial condition of the Partnerships as early as March 2001, and they had no obligation to provide further liquidity to the Partnerships. It is unclear from the record as to the disposition of the State Court Action, but the State Court did not enter a judgment entered in the case.

Prime's financial condition continued to deteriorate through the rest of 2001 and into 2002. Accordingly, Prime filed a petition for relief under Chapter 11 of the Bankruptcy Code on March 15, 2002. The United States Trustee appointed James Killips as the Chapter 11 trustee (the "Trustee") on August 15, 2003. Apparently, James McCart passed away sometime after Prime filed its petition for relief, but before the United States Trustee appointed Killips.

Trustee filed two separate adversary complaints against RCS, Schropp and Dahlke (collectively the "Defendants") to avoid the Transfers as either preferential under §547(b) or constructively fraudulent under §548(a)(1)(B). Trustee also sought to recover the value of the Transfers, $313,682.45 from RCS and Schropp, and $293,682.45 from Dahlke, under §550(a)(1).

The bankruptcy court consolidated the two adversary complaints for trial. Concerning the preference actions, the bankruptcy court found that the Defendants were insiders of Prime so that the one-year look back period contained in §547(b)(4)(B) applied. Also, because Prime did not make the Transfers within the 90 days prior to the petition date, the Trustee was not entitled to the statutory presumption of insolvency under §547(f).

A primary focus at trial was whether Prime was either insolvent at the time it made the Transfers or whether it had an unreasonably small amount of capital after it made the Transfers. Trustee produced Prime's balance sheet dated April 1, 2001 to demonstrate that Prime was insolvent at the time it made the Transfers (the "Balance Sheet"). Trustee testified that although he was not certain, he suspected that McCart prepared the Balance Sheet.

The Balance Sheet indicated that as of April 1, 2001, the value of Prime's assets exceeded its liabilities by approximately $165,000.00. Trustee testified, however, that when he reviewed the condition of Prime's assets in early 2003, the true market value of those assets were almost $2,000,000.00 less than the values reflected on Balance Sheet. Trustee also claimed on the liability side of the ledger that the Balance Sheet

-5-

failed to reflect that Prime was liable for a significant amount of special assessments on the Real Property. Trustee maintained that when he compared the true market value of Prime's assets with its liabilities, Prime was insolvent by at least $2,500,000.00.

With respect to the unreasonably small capital issue, Trustee produced a group of documents that he claimed evidenced that Prime was having difficulty meeting its financial obligations at the time of the Transfers. These documents include several default notices sent to Prime, RCS and Dahlke on loans executed by the Partnerships and several non-sufficient funds notices sent from Nebraska State Bank to Prime (collectively the "Default Notices"). The date of the Default Notices range from April 2001 through August 2001.

The bankruptcy court held that the Balance Sheet, on its face, indicated that Prime was solvent as of April 1, 2001. The bankruptcy court further noted that Trustee failed to introduce evidence that as of April 2001, the true market value of Prime's assets differed from the book value of those assets as listed on the Balance Sheet. Thus, the bankruptcy court held that Trustee failed to demonstrate that Prime was insolvent at the time it remitted the Transfers.

Concerning the question of whether Prime was left with an unreasonably small amount of capital after it made the Transfers, the bankruptcy court held that the Default Notices were not probative of Prime's capital structure at the time it made the Transfers. In fact, the bankruptcy court observed that the net effect of the various transactions that constituted the Plan resulted in a $1,600,000.00 cash infusion to

Prime.  The bankruptcy court concluded, therefore, that Trustee failed to prove that Prime operated with an unreasonably small amount of capital after it made the Transfers.

The bankruptcy court held that because Trustee failed to demonstrate that Prime was insolvent at the time it made the Transfers, Trustee failed to meet its burden of proof on the preference actions under §547(b)(3).  The bankruptcy court also held that because Trustee did not establish insolvency or that the Transfers left Prime with an unreasonably small amount of capital, Trustee did not meet his burden of proof on the fraudulent conveyance claims under §§548(a)(1)(B)(ii)(I) or (II).

The bankruptcy court, accordingly, entered judgement in favor of Defendants on both adversary complaints.  Trustee filed a timely notice of appeal and this appeal follows.

## II.

The bankruptcy court's determination that Trustee failed to establish that Prime was insolvent or was operating with an unreasonably small amount of capital when it made the Transfers are questions of fact that we review for clear error.  *Onix Credit Alliance v. Harvey (In re Haddox Contractor, Inc.)*, 40 F.3d 118, 120 (5th Cir. 1994) (insolvency); *F.P.P Enter. v. United States*, 830 F.2d 114, 117 (8th Cir. 1987) (small amount of capital).  A finding is clearly erroneous when "although there is evidence to support it ... the reviewing court is left with the definite and firm conviction that a mistake has been committed."  *In re Kaelin*, 308 F.3d 885, 889 (8th Cir. 2002).

III.

*A. The bankruptcy court did not error in finding that Trustee failed to establish his preference claims.*

Because the statutory presumption of insolvency does not apply, Trustee is required to prove by a preponderance of the evidence that Prime was insolvent at the time it remitted the Transfers to Defendants in order to prevail on the preference claims. 11 US.C. §547(g). Section 101(32)(A) of the Code defines insolvency as a state when an entity's debts are greater than the fair value of the entity's property. Thus, in determining whether the debtor was insolvent, the court should examine the debtor's balance sheet to determine whether the value of its assets were greater than its liabilities at the time of the transfer in question. *Silverman Consulting, Inc. v. Hitachi Power Tools, U.S.A., Ltd. (In re Payless Cashways, Inc.*), 209 B.R. 689, 699 (W.D. Mo. 2003).

Here, Trustee argues that the Balance Sheet and the Default Notices conclusively demonstrate that Prime was insolvent at all times relevant to the dispute in question. We disagree.

As the bankruptcy court properly observed, the Default Notices simply have no bearing on the value of Prime's assets or liabilities as of the date of the Transfers. The Default Notices, therefore, are irrelevant to the question of whether Prime was insolvent at the time it made the Transfers.

The Balance Sheet reflects that the book value of Prime's assets exceeded its liabilities by $164,000.00 as of April 1, 2001. The Balance Sheet, therefore, reflects that Prime was solvent as of April 1, 2001.

Trustee argues, however, that his testimony at trial established that Prime was insolvent at the time it remitted the Transfers. The bankruptcy court correctly rejected this argument for two reasons. First, Trustee undertook his analysis of the condition of Prime's assets and liabilities in early 2003, approximately two years after Prime remitted the Transfers in question. Thus, the bankruptcy court correctly concluded that Trustee's testimony was simply not probative to the question of whether Prime was insolvent in early 2001, the relevant time frame at issue here.

The second reason why Trustee's testimony fails to establish that Prime was insolvent is that Trustee is not a financial expert. The plaintiff, in order to establish insolvency, must generally produce expert testimony of an accountant or other financial expert that the "book" value of the property listed on the balance sheet is not the property's fair value. *Harvey v. Orix Credit Alliance, Inc. (In re Lamar Haddix Contractor)*, 40 F.3d 118, 121 (5th Cir. 1994).

Trustee is not an accountant, real estate appraiser or otherwise qualified to proffer an opinion as to the true value of Prime's assets in early 2001. In fact, as the bankruptcy court noted, Trustee did not proffer any testimony as to what valuation method Prime utilized in calculating the value of its assets reflected in the Balance Sheet. Given this record, the bankruptcy court correctly concluded that Trustee was

not competent to offer testimony as to the true market value of Prime's assets as of early 2001.

Trustee additionally maintains on appeal that because he offered evidence that Prime was insolvent at some point in time after it remitted the Transfers, the bankruptcy court should have found that Prime was also insolvent at the time that it made the Transfers. Some courts have allowed a plaintiff to establish that a debtor was insolvent by a method called retrojection. Under this method, a plaintiff may establish that the debtor was insolvent when it made the transfers in question if the plaintiff can establish both that the debtor was insolvent shortly after making the transfers and that the debtor's financial condition did not substantially changed in the interim. *See e.g. Parlon v. Clairborne (In re Kaylor Equip. & Rental, Inc.)*, 56 B.R. 58, 62 (Bankr. E.D. Tenn. 1985).

Here, Trustee failed to offer evidence as to exactly when, or even if, Prime became insolvent. Also, Trustee did not establish that Prime's financial condition had not substantially changed between the time of the Transfers and when it may have become insolvent. Thus, the bankruptcy court correctly refused to apply the doctrine of retrojection here.

Trustee additionally argues on appeal that the Defendants judicially admitted that Prime was insolvent in their answer to the State Court Action. This argument fails for two reasons. First, the specific portion of the answer that Trustee relies on alleges that as early as March 2001, McCart and Prime deceived Schropp and Dahlke about the ability of the Partnerships to service its debts secured by the Real Property.

Although this contention does relate to the ability of the Partnerships to meet its financial obligations as they came due, it is not evidence of whether Prime's assets exceeded its liabilities in March 2001. Thus, Schropp and Dahkle's statement in their answer cannot be construed as a judicial admission that Prime was statutorily insolvent at the time it remitted the Transfers.

Second, and more fundamentally, a party's statement made in a pleading in a prior case does not rise to the level of a judicial admission. *Bank One v. Prudential Ins. Co.*, 939 F.Supp. 533, 541 (N.D. Tex.1996). Rather, such a statement can only be used by the declarant's opponent as a statement against interest in the subsequent proceeding, which the trial court should weigh as any other admission. *First Bank of Marietta v. Hogge*, 161 F.3d 506, 510 (8th Cir. 1998).

Here, the bankruptcy court properly admitted Schropp and Dahlke's answer to the State Court Action into evidence. Also, as described above, the specific statement that Trustee relied on in the answer to the State Court Action did not relate to the value of Prime's assets or liabilities at the time it made the Transfers. Thus, that statement had little, if any, probative value to the insolvency analysis in the instant case.

After reviewing this evidentiary record, we are not left with a definite and firm conviction that the bankruptcy court erred in finding that Trustee failed to establish that Prime's liabilities exceed the value of its assets at the time it made the Transfers. The bankruptcy court's finding on insolvency, therefore, is not clearly erroneous.

Accordingly, the bankruptcy court did not err in finding that Trustee failed to meet his burden of proof on the preference actions under 11 U.S.C. §547(b)(3).

*B. The bankruptcy court did not err in finding that Trustee failed to establish his fraudulent conveyance claims.*

The bankruptcy court also found that Trustee failed to meet his burden of proof in his fraudulent conveyance claims. In order to prevail in a fraudulent conveyance action, a plaintiff must establish by a preponderance of the evidence either one of the following: (1) that the debtor made the transfer in question while it was insolvent, or become insolvent because of the transfer; or (2) that the debtor was operating its business after the transfer with an unreasonably small amount of capital. 11 U.S.C. §548(a)(1)(B)(ii)(I) and (II). Here, the evidentiary record supports the bankruptcy court's conclusion that Trustee failed to prove either requirement by a preponderance of the evidence.

As discussed above, the bankruptcy court's factual determination that Prime was not insolvent at the time it remitted the Transfers is not clearly erroneous for purposes of §547(b)(3). The fraudulent conveyance statute, however, is slightly different than the preference statute in that the former allows the plaintiff to avoid not only a transfer made when the debtor was insolvent, but also a transfer that makes the debtor insolvent.

Here, the Balance Sheet reflects that Prime was solvent by $165,000.00 as of April 1, 2001. As noted above, after the Transfers, the net effect of the Plan provided

approximately $1,600,000.00 of cash to Prime. Thus, the only evidence in the record as to a change in Prime's balance sheet after April 1, 2001 was the $1,600,000.00 in cash provided by the net effect of the Plan.[2] The evidence, therefore, supports the bankruptcy court's conclusion that Prime did not become insolvent because of the Transfers.

The record also supports the bankruptcy court's conclusion that Prime was not operating with an unreasonably small amount of capital after it made the Transfers as provided in §548(a)(1)(B)(ii)(II). The determination of whether the debtor was operating with an unreasonable small amount of capital should focus on the debtor's ability to generate enough cash from operations or the sale of assets to pay its debts as they become due and remain a financially viable going concern. *Dahar v. Jackson (In re Jackson)*, 459 F.3d 117, 123-24 (1st Cir. 2006).

Here, Trustee relied exclusively on the Default Notices to establish that Prime was operating with an unreasonably small amount of capital after it remitted the Transfers. It is true that when a debtor has insufficient cash in its checking account to pay the checks it remits to its creditors, a court may conclude that it is operating with an unreasonably small amount of capital for purposes of §548(a)(1)(B)(ii)(II). *W.E. Tucker Oil Co. v. First State Bank of Crossett (In re W.E. Tucker Oil Co.)*, 55 B.R. 78, 82 (Bankr. W.D. Ark. 1985). The Default Notices reflect that Prime did not

___

[2] The Court also notes that Prime's long term obligation to RCS and Dahlke pursuant to the Purchase Contracts are not considered liabilities on Prime's balance sheet in the insolvency analysis. *See Official Comm. of Former Partners v. Brennan (In re Labrum & Doak, LL.P.)*, 227 B.R. 383, 389-90 (Bankr. E.D. Pa. 1998)

have sufficient cash in its checking account to cover several checks it had presented to its creditors for payment from April through July of 2001. Thus, there is evidence in the record that supports Trustee's position on this issue.

But there is also evidence that supports the bankruptcy court's finding. Prime continued to operate as a going concern for almost a year after it remitted the Transfers. Additionally, and more importantly, Trustee failed to introduce any evidence as to Prime's actual capital structure after it remitted the Transfers. There is no evidence in the record concerning Prime's cash flow or statement of cash during the relevant time frame. In fact, as the bankruptcy court noted, the only evidence in the record as to Prime's capital structure after it made the Transfers is that it netted nearly $1,600,000.00 in cash from the Plan.

Given this record, although there is some evidence to support Trustee's position, we are not left with a definite and firm conviction that Trustee established that Prime was operating with an unreasonably small amount of capital after it made the Transfers. We, therefore, conclude that the bankruptcy court's finding that Trustee failed to establish that Prime was operating with an unreasonably small amount of capital was not clearly erroneous.

*C. The bankruptcy court's prior order does not collaterally estop Defendants from denying that Prime was either insolvent or operating with an unreasonably small amount of capital.*

Trustee finally argues that a prior order of the bankruptcy court entered in an another adversary proceeding involving Schropp and Dahlke collaterally estops them from denying that Prime was either insolvent or operating with an unreasonably small amount of capital (the "Prior Order"). Trustee specifically argues that the bankruptcy court's following finding of fact in the Prior Order collaterally estops Schropp and Dahlke: "[d]uring 2001 and 2002, there were many forecloses and substantial sums of money were lost by the partners and their lenders."

The elements of collateral estoppel under federal law are: 1) the party sought to be precluded in the second suit must have been a party, or in privity with a party, to the original lawsuit; 2) the issue sought to be precluded must be the same as that involved in the prior action; 3) the issue must have been litigated in the prior action; 4) the issue must have been determined by a valid and final judgment; and 5) the determination must have been essential to the prior judgment. *Sells v. Porter (In re Porter),* 375 B.R. 822, 826 -827 (B.A.P. 8th Cir.2007). We find that the Prior Order did not adjudicate the issue of Prime's insolvency or whether it was operating with an unreasonably small amount of capital.

Here, the factual determination made by the bankruptcy court in its Prior Order relates directly to the Partnerships' ability to service the debt secured by the Real Property. The only comment in the Prior Order concerning Prime's financial condition is that "substantial sums of money were lost by the partners." This finding simply does not conclusively determine whether Prime was insolvent or operating with an unreasonably small amount when it made the Transfers,. Thus, the Prior

-15-

Order does not collaterally estop Schropp or Dahlke from denying that Prime was either insolvent or operating with an unreasonably small amount of capital.

## IV.

After reviewing the evidentiary record before us, we are not left with a definite and firm conviction that Trustee met his burden of proof in establishing that Prime was insolvent at the time it remitted the Transfers. We also find that the record does not leave us with a definite and firm conviction that Trustee established either that the Transfers made Prime insolvent or that Prime operated its business after the Transfers with an unreasonably small amount of capital. Accordingly, the bankruptcy court's conclusion that Trustee failed to meet his burden of proof on both his preference and fraudulent conveyance causes of action is not clearly erroneous.

The bankruptcy court also did not err in finding that Defendants' answer in the State Court Action was not a binding judicial admission that Prime was either insolvent or operating its business with an unreasonably small amount of capital after it made the Transfers. Additionally, the bankruptcy court correctly concluded that its Prior Order did not collaterally estop Schropp or Dahlke from denying that Prime was either insolvent or operating with an unreasonably small amount of capital in the instant cases.

Accordingly, we affirm the two judgments of the bankruptcy court in favor of Defendants.

---