# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 22-2125

———————————————

Todd J. Mortier, as Member Representative of the former Members of Caisson Interventional, LLC

*Plaintiff - Appellant*

v.

LivaNova USA, Inc.

*Defendant - Appellee*

————————

Appeal from United States District Court
for the District of Minnesota

————————

Submitted: February 14, 2023
Filed: June 2, 2023

————————

Before LOKEN, COLLOTON, and BENTON, Circuit Judges.

————————

BENTON, Circuit Judge.

　　Todd J. Mortier invented a medical device. He sold it to LivaNova USA, Inc. in order to develop and bring to market. When LivaNova shut down the project, he

sued.  The district court[1] granted summary judgment for LivaNova.  Mortier appeals.
Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

I.

Mortier and a colleague imagined a less-invasive treatment for mitral valve
disease, a heart condition then primarily treated with open-heart surgery.  His
transcatheter mitral valve replacement (TMVR) device would be inserted into a vein
in the groin, navigate to the heart, and then anchor to the diseased heart valve with
flared feet.  Mortier and his colleague secured provisional patents and created a new
company, Caisson Interventional, LLC, to develop the TMVR system.

In 2012, Caisson contracted with LivaNova, a multi-national medical-device
company, to advance the TMVR system.  LivaNova agreed to periodically purchase
Caisson stock as the device met developmental and regulatory milestones.  When
the device achieved a CE Mark,[2] LivaNova had the option to purchase all remaining
Caisson stock.  Over the next four years, LivaNova provided funds as Caisson met
milestones.  By 2016, LivaNova had invested $23 million in Caisson and owned
49.1% of its stock.

The parties decided that LivaNova would buy Caisson's remaining equity
even though the device had not yet acquired a CE Mark.  They executed a Unit
Purchase Agreement in May 2017.  LivaNova agreed to pay up to $72 million, split
between upfront money and milestone payments.  After executing the UPA,

---

[1]The Honorable Eric C. Tostrud, United States District Court Judge for the
District of Minnesota.

[2]The CE (Conformitè Europëene) Mark confirms that a product meets all
relevant European requirement and can be sold in the European Union.  *See* Your
Europe,  ***CE Marking*** (last visited Aug.13, 2023), *available at*
https://europa.eu/youreurope/business/product-requirements/labels-markings/ce-
marking/index_en.htm.

Caisson's founders continued developing the device as an independent team within LivaNova.

Two UPA provisions matter. Section 4.3 defines LivaNova's obligations to advance the device's development and facilitate the milestone payments. Section 7.13 stated that LivaNova had adequate financial resources to satisfy its obligations under the agreement.

After joining LivaNova, Caisson struggled. In 2017 and 2018, it received less money from LivaNova than initially budgeted. Things worsened in late 2018—the device, due to a design defect, killed two clinical-trial patients and injured several others. As Caisson's clinical trials floundered, a competitor's bore fruit. Not only did the competitor's device successfully treat the problem Caisson aimed to solve, but it also did so less invasively than the Caisson device.

LivaNova encountered some problems of its own. It paid substantially more than anticipated to settle a large lawsuit, missed its revenue-and-earnings targets by a large margin, and restructured under new management.

This all spurred changes for Caisson. LivaNova revised Caisson's business plan in early 2019, noting that the project still held significant upside but entailed significant risk, too. The device would have to be redesigned and retested, requiring extensive funding before it could hope for regulatory approval and profit.

LivaNova decided to cut Caisson. It first tried selling the project, retaining Goldman Sachs to approach potential buyers. When that went nowhere, LivaNova shut down the Caisson project. LivaNova had spent over $100 million on Caisson. It did not earn a cent.

Mortier—believing that the UPA prevented LivaNova from shutting down Caisson like it did—sued for the $39.6 million potentially due if the device had reached all three remaining UPA milestones: CE Mark approval, FDA premarket

-3-

authorization, and \$108 million in sales in the first ten years. The district court granted summary judgment for LivaNova. Mortier appeals, arguing that LivaNova breached sections 4.3 and 7.13 of the UPA and its duties of good faith and fair dealing under the UPA.

"This court reviews de novo a grant of summary judgment." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). This court affirms if there is "no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*, *quoting* **Fed. R. Civ. P. 56(c)(2)**. "A fact is 'material' if it may 'affect the outcome of the suit.'" *Erickson v. Nationstar Mortg., LLC*, 31 F.4th 1044, 1048 (8th Cir. 2022), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There exists "a genuine issue for trial" where a rational trier of fact, considering the record "as a whole," could find for the nonmoving party. *Torgerson*, 643 F.3d at 1042, *quoting Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

## II.

Mortier brings two breach-of-contract claims. Both require interpreting the parties' contract, the UPA, under Delaware law. *See* **UPA** § 11.4. "[C]lear and unambiguous [contract] terms are interpreted according to their ordinary and usual meaning." *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009). Courts "give priority to the parties' intentions as reflected in the four corners of the agreement." *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012). When contract language is ambiguous, courts "look beyond the language of the contract to ascertain the parties' intentions," but "[a] contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." *Id.* at 780.

## A.

Mortier argues that LivaNova breached section 4.3 of the UPA by shuttering Caisson. Section 4.3 reads (italics added):

-4-

**Section 4.3** Purchaser and Company Efforts. Purchaser [LivaNova] shall, and shall cause the Company to, undertake such efforts and use such level of care to obtain or achieve, and make business decisions related to obtaining, achieving, (a) the CE Mark Achievement and (b) PMA, as are *consistent with the efforts and level of care and business decisions Purchaser and its affiliates employ generally in the process of seeking, prosecuting and eventually obtaining product regulatory approvals worldwide from time to time*, including considerations with regard to the cost/benefit, internal rate of return and return on investment of such business decisions. Purchaser shall also, and shall also cause the Company to, undertake such efforts and business decisions with respect to sales of Covered Products, which are subject to the Earn-Out Payments as are *consistent with the efforts and level of care and business decisions Purchaser and its affiliates employ generally in their business from time to time*.

The parties dispute the meaning of LivaNova's obligation to be "consistent with the efforts and level of care and business decisions [LivaNova] and its affiliates employ generally." Mortier emphasizes the obligation to act "consistent with" the (1) efforts, (2) levels of care, and (3) business decisions employed in LivaNova's other projects. LivaNova stresses the authorization to act as it "generally" does.

A proper construction of the UPA effectuates both the words "consistent" and "generally." *See **E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.**,* 498 A.2d 1108, 1113 (Del. 1985) ("[A] court must construe the agreement as a whole, giving effect to all provisions therein."). LivaNova had to make its usual efforts, exercise its usual level of care, and make its usual type of business decisions—which is treating Caisson "consistent with" the way it "generally" treated its projects. In other words, the UPA requires evaluating LivaNova's actions against a counterfactual: the "general" way that LivaNova would fund a project with Caisson's promises and perils. Acts not "consistent" with this "general" approach would breach the UPA.

-5-

Mortier argues that LivaNova failed to act consistently with its general approach. Even if shutting down Caisson appears normal for the average business, he claims, LivaNova "generally employed" special efforts, care, and business decisions that, per the UPA, had to extend to Caisson. His argument begins by inferring a "general" approach to Caisson's development from LivaNova's other developmental projects. With this LivaNova-specific standard in hand, he then argues that treating Caisson differently than other projects breached the UPA.

Mortier's reasoning is sound, but the record belies his claim. Evidence that LivaNova treated *similarly situated* companies differently than it treated Caisson might carry Mortier's claim past summary judgment. *Cf.* **Wimbley v. Cashion**, 588 F.3d 959, 962 (8th Cir. 2009) (disparate treatment of the plaintiff and another employee "similarly situated in all relevant respects" allows race- and sex-discrimination claims to survive summary judgment). But Mortier points to no such evidence in the record—Caisson's particularities undercut Mortier's premise that a "general approach" to its development can be inferred from LivaNova's other projects. When Mortier argues that Caisson was *treated* differently than other projects, LivaNova presents evidence that Caisson *was* different than other projects. With only apples-to-oranges comparisons available on this record, Mortier cannot establish a "general" approach to developing the unique Caisson device and thus cannot show inconsistency with the UPA's requirements. *See* **VLIW Tech., LLC v. Hewlett-Packard Co.**, 840 A.2d 606, 612 (Del. 2003) (breaching a contractual obligation required for breach-of-contract claims).

Consider the main difference between Caisson and LivaNova's other projects. Caisson's "setbacks" led LivaNova to shut it down rather than plow ahead. Mortier notes that four other projects suffered setbacks without shutdowns. This proves, the argument goes, that LivaNova "employ[s] generally" a practice of soldiering through difficulties when developing a device like Caisson, and so LivaNova had to continue with Caisson despite its challenges.

In this case, however, the other projects' challenges differ too greatly from Caisson's to show a general approach to setbacks. Caisson faced three roadblocks: a competitor's device was flourishing, its own device was lethally defective, and projections characterized it as "high risk" of regulatory rejection and commercial failure. No other LivaNova project faced the same confluence of challenges. Three of the projects suffered only minor setbacks like low study enrollment. The one project where a device being developed by LivaNova caused patient deaths, ImThera, was categorized as medium rather than high-risk. These four projects do not establish LivaNova's "general[]" practice for a device like Caisson and thus cannot support Mortier's argument that LivaNova departed from its usual approach.

Mortier's other claimed inconsistencies falter on the same shoal. His claim that LivaNova shut down Caisson in part to avoid tax liability does not allege that LivaNova "generally" would not shut down projects to avoid tax liability. His claim that LivaNova chose inexperienced Goldman Sachs bankers for the sale does not aver that LivaNova "generally" chose better bankers. And his claim that LivaNova kept Caisson independent from the corporate structure does not establish that LivaNova "generally" integrated projects with independent-minded founders like Caisson's.

Even Mortier's strongest evidence suffers a similar infirmity. Comparing Caisson and ImThera, a former LivaNova executive testified that LivaNova "didn't employ the same level of effort and care and the same level of commitment to remediate the problems that occurred in the development." The executive's testimony, accepted as true on appeal, shows only that LivaNova treated Caisson differently than it treated ImThera. But the UPA does not require consistency with ImThera—it requires consistency with LivaNova's general efforts, care, and business practices. That a single different project with different characteristics received different treatment does not show that LivaNova breached the UPA.

Unable to establish LivaNova's general practices through project-by-project comparison, Mortier argues that the phrase "business decisions . . . employ[ed]

-7-

generally" sets a standard of care that LivaNova breached. The ordinary meaning of that phrase undermines his argument. *See Paul*, 974 A.2d 145 (giving terms "their ordinary and usual meaning). LivaNova supported its acts with sensible contemporaneous explanations. Caisson sputtered. It killed patients and required a redesign. Competitors, meanwhile, enjoyed breakthroughs. Righting the ship would have required significant time and expense, and even then Caisson carried high risk of failure. LivaNova's internal documents show serious doubt about Caisson's financial and technical viability, even though regulatory approval remained possible and Caisson scored well on at least one metric, the internal rate of return. Applying an "ordinary and usual" understanding of the contract, *id.*, shutting down Caisson appeared in line with the efforts, care, and business decisions that LivaNova would "employ generally in [its] business from time to time."

Because LivaNova did not breach the UPA's unambiguous requirements, the district court properly dismissed Mortier's breach-of-contract claim. *See VLIW Tech.*, 840 A.2d at 612. *See also GMG Cap. Invs.*, 36 A.3d 776, 780 ("A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction.").

B.

Mortier alleges a second breach, this one caused by LivaNova's failure to maintain the capital it promised. UPA section 7.13 reads:

> The Purchaser [LivaNova] hereby represents and warrants to the Members and the company [Mortier and Caisson] that:
>
> * * *
>
> **Section 7.13** <u>Adequacy of Funds; Solvency</u>. Purchaser has adequate financial resources and cash to satisfy its monetary and other obligations under this Agreement. After giving effect to the transactions contemplated by this Agreement and assuming the truth and accuracy in all

material respects of the representations and warranties of the Company under this Agreement, on a consolidated basis (a) the fair value of the properties of Purchaser will exceed its debts and liabilities, subordinated, contingent or otherwise; (b) the present fair saleable value of the Purchaser's property will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (c) Purchaser will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (d) Purchaser will not have unreasonably small capital with which to conduct the business in which it is engaged as such business is now conducted and is proposed to be conducted following the consummation of the transactions completed hereby.

The parties again dispute the contract's interpretation. Mortier, emphasizing future-tense language ("Purchaser *will not* have unreasonably small capital . . ."), argues that section 7.13 created a continuing warranty to maintain "sufficient financial resources and cash on hand to prevent the kind of sacrificial decision that LivaNova ultimately made with Caisson." LivaNova, emphasizing present-tense verbs ("Purchaser *has* adequate financial resources . . ."), argues that "the warranty on adequate funding applies only at the time of closing, not later."

Applying the principles of contract interpretation outlined above, this court finds that the section imposed upon LivaNova, at most, a limited future obligation to maintain enough capital to fulfill its UPA obligations. The section did not impose a boundless future obligation to remain solvent. Mortier underscores the sentence "(d) Purchaser will not have unreasonably small capital with which to conduct the business in which it is engaged." Properly understood, this is a guarantee of solvency only after paying the purchase and closing costs. The introductory language makes this clear: "After giving effect to the transactions contemplated by this Agreement . . . (d) Purchaser will not have unreasonably small capital with

-9-

which to conduct the business in which it is engaged." *See Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 68 A.3d 1208, 1225 (Del. 2012) ("[A]ll contract provisions [should] be harmonized and given effect where possible.").

Section 7.13's first sentence is key to understanding LivaNova's limited future obligation: "Purchaser has adequate financial resources and cash to satisfy its monetary *and other obligations under this Agreement*." (emphasis added). One "other obligation under [the UPA]," Mortier points out, is section 4.3's obligation to use "the efforts and level of care and business decisions Purchaser and its affiliates employ generally in their business from time to time." Construed as a whole, the contract warranted that LivaNova had "adequate financial resources and cash" to employ "the efforts and level of care and business decisions" generally used. *See GMG Capital Invs.*, 36 A.3d at 779 ("[A] court must construe the agreement as a whole, giving effect to all provisions therein.").

Other than section 4.3—which, as discussed, LivaNova did not breach—Mortier identifies no "other obligations under [the UPA]" allegedly breached by LivaNova's inadequate financial resources. If the UPA had vaguely required financial resources be "adequate" like some contracts require efforts be "reasonable," a jury might have to decide the issue. *See, e.g.*, *In re Prime Realty, Inc.*, 380 B.R. 529, 534 (B.A.P. 8th Cir. 2007). But the contract here required funds to be adequate *for a particular purpose*; namely, satisfying other UPA obligations. Finding no indication in the record or briefs that LivaNova breached any "other obligation" due to inadequate financial resources, this court concludes that Mortier did not create a genuine factual dispute about whether LivaNova breached section 7.13.

III.

In "rare" cases, Delaware courts imply a contract term necessary to fulfill the parties' "reasonable expectations." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005). This is done only "when it is clear from the writing that

the contracting parties would have agreed to proscribe the act complained of . . . had they thought to negotiate." *Id.* The Delaware Supreme Court has cautioned: "Implying terms into a written contract should be a cautious enterprise." *Murfey v. WHC Ventures, LLC*, 236 A.3d 337, 350 (Del. 2020). *See also Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1032 (Del. Ch. 2006) (cautioning courts "not to overestimate the circumstances when it is appropriate" to find an implied covenant of good faith, which requires an "intrinsically counterfactual and hindsight-bias prone test.").

Mortier proposes two implied contractual clauses. Neither works. First, he suggests an implied covenant to avoid arbitrary and unreasonable decision-making about Caisson's development. Section 4.3 of the UPA already contains a similar clause, which precludes implying it. *See Oxbow Carbon & Mins. Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 507 (Del. 2019) (implied covenants should be used only "when the contract is truly silent concerning the matter at hand").

Second, Mortier retreats to the narrower claim that the implied covenant required LivaNova sell Caisson in a particular way. This claim fails to clear the high hurdle Delaware sets for implied covenants between sophisticated parties. *See Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 919 (Del. 2021). Mortier offers no evidence that, had the parties "thought to negotiate" about the sale, they "would have agreed" to a contract forbidding LivaNova from using Goldman Sachs to attempt a sale. *Dunlap*, 878 A.2d at 442. Without such evidence, Mortier's implied-contract claim cannot survive summary judgment.[3]

---

[3]Because this court affirms dismissal of Mortier's claims on the merits, it need not address LivaNova's request to dismiss the suit for claiming impermissibly speculative damages.

## IV.

In sum, because the UPA is not ambiguous, its plain language "is the sole source for gaining an understanding of intent" and this court may not "destroy or twist [the] language under the guise of construing it." ***Fairstead Cap. Mgmt. LLC v. Blodgett***, 288 A.3d 729, 759 (Del. Ch. 2023), *quoting* ***Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.***, 616 A.2d 1192, 1195 (Del. 1992) *and* ***City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.***, 624 A.2d 1191, 1198 (Del. 1993).

Even if this court could look beyond the UPA's language, this case shows the wisdom of "[h]olding sophisticated contracting parties to their agreement." ***Glaxo Grp.***, 248 A.3d at 919. Uncertainty and risk pervade medical device development—even the most promising ideas require tremendous investment and face uphill battles. Caisson's founders, wanting to reap the rewards of commercial success, selected a classic market-based solution: aligned profit incentives. The UPA guaranteed that, whether Caisson prospered or failed, LivaNova and Mortier would be in the same boat. But when Caisson crashed, Mortier disavowed the UPA's structural profit-incentive-alignment.

The fact is, the device did not work. Mortier may be unhappy or wish for a stricter contract, but "[p]arties have a right to enter into good and bad contracts," and "the court's role is to enforce the agreement as written." ***Id.***

\* \* \* \* \* \* \*

The judgment is affirmed.

_____